UNITED STATES BANKRUPTCY COURT

DISTRICT OF SOUTH CAROLINA

| | |
|---|---|
| IN RE: | ) |
| | ) B/K Case No.: 18-01358-JW |
| FREDERICK S. ALDERSON | ) Chapter 11 |
| | ) |
| Debtor | ) NOTICE OF MOTION/APPLICATION AND |
| | ) OPPORTUNITY FOR HEARING |
| 23 John Galt Way | ) |
| Mt. Pleasant, SC 29464 | ) |
| | ) |
| Last four of Social Security: 9444 | ) |

TO: All Creditors and Parties in Interest

Frederick S. Alderson (the "Debtor"), has filed papers with the court to obtain approval of an agreement reached with Colette Winters f/k/a Colette Alderson (the "Creditor") concerning the resolution of certain issues according to the terms and conditions stated below.

Your rights may be affected. You should read these papers carefully and discuss them with your attorney, if you have one in this bankruptcy case. (If you do not have an attorney, you may wish to consult one.)

If you do not want the court to grant the relief requested, or you want the court to consider your views on the application, then within twenty-one (21) days of service of this notice, you or your attorney must:

File with the court a written response, return, or objection at:

1100 Laurel Street
Columbia, SC 29201

Responses, returns, or objections filed by an attorney must be electronically filed in ecf.scb.uscourts.gov.

If you mail your response, return, or objection to the court for filing, you must mail it early enough so the court will **receive** it on or before the date stated above.

You must also send a copy to:

Kevin Campbell
Post Office Box 684
Mount Pleasant, SC 29465

Attend the hearing scheduled to be heard on February 13, 2019 at 10:30 a.m. at the United States Bankruptcy Court, 145 King Street, Room 225, Charleston, South Carolina.

If no response, return, and/or objection is timely filed and served, no hearing will be held on this application, except at the direction of the judge.

If you or your attorney do not take these steps, the court may decide that you do not oppose the relief sought in the application and may enter an order granting that relief.

NATURE OF DISPUTE:     Prior to the filing of this bankruptcy case the Debtor and the Creditor were involved in extensive Family Court litigation concerning alimony, maintenance, support, visitation, property settlement and other issues.

AMOUNT DISPUTED:     Approximately Three Million and 00/100 ($3,000,000.00) Dollars.

PROPOSED SETTLEMENT OR COMPROMISE:     Through subsequent discussions and negotiations the parties have agreed to resolve their issues on the terms and conditions set forth in the attached Settlement Agreement, the terms of which are incorporated herein by reference.

BENEFIT TO THE ESTATE: Because of the additional costs and attorney fees pursuing the litigation, with the uncertainty of results, the Debtor is informed and believes that the settlement of this dispute on these terms is in the best interest of the Estate and its creditors.

Kevin Campbell, Esq.                    George B. Cauthen
Attorney for the Debtor                 Attorney for the Creditor
Post Office Box 684                     1320 Main Street, 17th Floor
Mt. Pleasant, SC 29465                  Columbia, SC 29201

The parties believe that this agreement does not contain any provision that the Court does not normally approve.

Respectfully submitted,

CAMPBELL LAW FIRM, P.A.

/s/ Kevin Campbell
KEVIN CAMPBELL
Attorney for the Debtor
Post Office Box 684
Mt. Pleasant, SC 29465
(843) 884-6874/(843) 884-0997(fax)
District Court I.D. No. 30
kcampbell@campbell-law-firm.com

Mt. Pleasant, South Carolina
This 21st day of December, 2018

| STATE OF SOUTH CAROLINA | ) | |
|---|---|---|
| | ) | SETTLEMENT AGREEMENT |
| COUNTY OF CHARLESTON | ) | |

Whereas, Colette Winters (hereinafter referred to as "Creditor") and Frederick Scott Alderson (hereinafter referred to as "Debtor") (hereinafter collectively referred to as "Parties") were previously married, the bonds of matrimony having been dissolved by an Order of the Family Court for the Ninth Judicial Circuit, Charleston, SC (hereinafter referred to as "Family Court"); and

Whereas, in a proceeding prior to the divorce proceeding, the Parties entered into an Agreement that was approved by an Order of the Family Court on April 8, 2016 (hereinafter referred to as "CSA"); and

Whereas, certain defaults were made in the payment of the obligations by the Debtor to the Creditor under the terms of the CSA and certain of the defaults were still pending at the time the Debtor filed a Chapter 11 bankruptcy case with the Bankruptcy Court for the District of South Carolina, Charleston Division (hereinafter referred to as "Bankruptcy Court"), filed on March 19, 2018, as Bankruptcy Case Number 18-01358 (hereinafter referred to as "Bankruptcy Case"); and

Whereas, the Debtor owes the Creditor $2,868,000.00 in outstanding payment obligations originating from the CSA, as well as $76,000.00 to the children's 529 plans (also included in the CSA), and the Debtor has agreed to pay $40,000.00 towards the total attorney fees incurred by the Creditor in connection with the filing of the Bankruptcy Case and $10,000.00 as more fully described below in paragraph 24 (hereinafter collectively referred to as "Creditor's Claim"); and

Whereas, Debtor may owe the Creditor a bonus payment up to $2,000,000.00 which commences if Debtor receives Future Income (as defined at paragraph d. on page 16 of the CSA, except that the date for the final calculation is extended to December 31st, 2024) from any of his entities in excess of $8,550,000.00 (the "Bonus Payment") as further described in paragraph 12 herein; and

Whereas, the parties now desire to enter into a Settlement Agreement (hereinafter referred to as "Agreement") which will resolve all outstanding pre-bankruptcy petition payment issues amongst the Parties, with the exception of fees and costs of either party relating to the pending custody action 2018-DR-10-248; expenses of the children pursuant to the CSA; and

1

Whereas, the Parties have agreed to allow the Debtor 42 months from the date the Debtor makes his first payment due under the Agreement to pay the Creditor's Claim in full (hereinafter referred to as the "Maturity Date"); and

Whereas, the Parties enlisted the services of Dixon Hughes Goodman LLP (hereinafter referred to as "Dixon Hughes") to compile a report (hereinafter referred to as "Dixon Hughes Report") by analyzing the payment plan proposed to Creditor in accordance with this Agreement and identifying ongoing cash flow expectations; and

Whereas, during the proceedings in the Family Court, the Creditor was represented by Marie-Louise Ramsdale (hereinafter referred to as "Creditor's Counsel").  During the Bankruptcy Case, the Creditor was represented by George Cauthen of Nelson Mullins Riley & Scarborough LLP (hereinafter referred to as "Nelson Mullins"); and

Whereas, during the proceedings in the Family Court, the Debtor was represented by Anne Frances Bleecker (hereinafter referred to as "Debtor's Counsel").  During the Bankruptcy Case, the Debtor was represented by Kevin Campbell of Kevin Campbell Law Firm; and

Whereas, the automatic stay is modified in accordance with the Interim Consent Order Granting Relief from Stay to Continue or Pursue Action in Family Court entered by the Bankruptcy Court on May 22, 2018 (Docket No. 48).

Now, therefore, for and in consideration of these promises and for other valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the parties agree as follows:

1. The total of the Creditor's Claim that is owed by the Debtor is $2,994,000.00.

2. Both the Creditor's Claim and the Bonus Payment shall be non-dischargeable and excepted from the entry of any discharge order in the Bankruptcy Case and any subsequent bankruptcy cases or any action in the Family Court.

3. Payments made by the Debtor to the Creditor will be made by direct deposit by the Debtor to a bank account previously identified by Creditor to Debtor.  In the event that the Creditor would desire that this bank account be changed, she will provide a notice of at least 30 days, by certified mail, to the Debtor.

4. Until the Creditor's Claim is paid in full, the Debtor will place all money he receives into his existing DIP account only and will make all payments to the Creditor from this account.  The Debtor will provide Creditor, through Creditor's Counsel, a copy of the Debtor's Quarterly Periodic Report and Monthly Operating Report, which includes a DIP account statement and copies of written checks, and copies of any documents required to be filed with any federal

or state taxing entity every month until the Bankruptcy Case is dismissed, converted, or otherwise terminated by order of the Bankruptcy Court. If the Bankruptcy Case is dismissed, the DIP account will be converted into a trust account with the Creditor as the only beneficiary, and the Debtor will continue to place all money he receives into this trust account only and will make all payments to the Creditor from this trust account until the Creditor's Claim is paid in full. The Debtor will continue to provide Creditor, through Creditor's Counsel, the full account statement for this trust account, including copies of written checks and copies of any documents required to be filed with any federal or state taxing entity, every month until the Creditor's Claim is paid in full. In addition, the Debtor will provide a Monthly Operating Report and Quarterly Periodic Report to Creditor through Creditor's Counsel until Creditor's Claim is paid in full. If the Bankruptcy Case is converted, the DIP account will become property of the Chapter 7 Trustee.

5.  Until the Creditor's Claim is paid in full, Debtor will pay Creditor a minimum of $10,000.00 per month due on or before the 5th calendar day of each month, with the first payment due on the date the Agreement is executed amongst the parties with no late payment permitted as to that initial payment, and continuing each month thereafter. These payments will be applied toward the Creditor's Claim and will continue for 42 months including Debtor's first payment due under the Agreement _or_ until the Creditor's Claim is paid in full, whichever occurs earlier. Payments will be applied first to reimburse Creditor for the $50,000.00 in fees provided for herein; then to the equitable division payments due; then to 529 plan payments due; and then to alimony due. These payments will be paid by the Debtor directly or from the distributions as set forth below, with the funds directly deposited into the Creditor's above-referenced checking account, subject to the provision of paragraph 7.

6.  Each monthly payment (due on the 5th calendar day of each month following the month this Agreement is executed) will have a 30-day drop dead provision while the Debtor remains in bankruptcy and a 20-day drop dead provision after the Bankruptcy Case is dismissed.

7.  After the Agreement has been signed by the parties, but prior to the Agreement being approved by the Bankruptcy Court, all payments made by the Debtor will be paid directly to Nelson Mullins. The payments will be held in trust until such time as the Agreement has been approved by a final order of the Bankruptcy Court. If the Agreement is approved by the Bankruptcy Court, then Nelson Mullins will distribute the money to the Creditor to be applied in accordance with the terms of the Agreement. If the Agreement is not approved by the Bankruptcy Court, then it will be held by Nelson Mullins until further order of the Bankruptcy Court or upon further agreement of the parties. If the Agreement is not approved by the Bankruptcy Court, then either of the Parties may, at their option, consider

3

this Agreement to be terminated, although the Creditor will not oppose a request by the Debtor for a 90-day extension to file a plan and disclosure statement.

8. Debtor will issue a note and mortgage on the property located at 23 John Galt Way, Mount Pleasant, South Carolina 29464 (hereinafter referred to as "John Galt Property") to secure the full amount of Creditor's Claim. This note and mortgage will be prepared at Debtor's expense by Lisa Wolff Herbert. Within thirty (30) days after the execution of this document by the Parties, the Debtor will provide the fully executed note and mortgage to Nelson Mullins to be held in trust unless and until the Agreement is approved by the bankruptcy court, at which time Nelson Mullins may record the mortgage with the Registrar of Deeds for Charleston County. On the date the Agreement is executed, Debtor will execute an affidavit that the balance of the mortgage on the John Galt Property does not exceed $1,560,000.00 and that there are no other liens against the John Galt Property other than the first mortgage. Debtor shall not otherwise encumber the John Galt Property until the Creditor's Claim is paid in full. *See* Dixon Hughes Report, at p. 2.

9. Commencing the date the Agreement is executed and continuing until the Creditor's Claim is paid in full, the Debtor will provide Creditor with a properly recorded and perfected lien on Global Financial Services Consulting LLC (hereinafter referred to as "GFS"), a copy of which is attached, which will be prepared by Nelson Mullins at Creditor's expense. These documents will be signed within thirty (30) days after the Agreement has been executed by the Parties and delivered to Nelson Mullins to be held in trust unless and until the Agreement is approved by the bankruptcy court, at which time Nelson Mullins will record the documents in the proper recording office at Debtor's expense. GFS owns the following assets:

| | |
|---|---|
| SJ Management LLC | ($675,000.00 loan outstanding + 20% equity) |
| Cloverlight LLC | ($1,250,000.00 loan outstanding + 16% equity) |
| Watertech Holdings LLC | ($550,000.00 loan outstanding) |
| Select Ventures Fund I LLC | ($120,000.00 Capital Account Value) |

Debtor agrees not to change the name or the ownership of GFS or transfer GFS's ownership in the above entities without Creditor's approval. Debtor agrees to provide notice to Creditor's counsel of any of the companies' intent to transfer assets other than in the ordinary course of their business for an amount that exceeds $5,000.00 within ten (10) days of the receipt of such notice.

4

Until the Creditor's Claim is paid in full, within ten (10) days of receipt, Debtor will pay Creditor 70% of any Future Income (as defined at paragraph d. on page 16 of the CSA but also including repayment of loans/return of invested funds) related to the aforementioned entities (*See* Dixon Hughes Report, at p. 2). This payment will be subject to a 30-day drop dead provision while the Debtor remains in bankruptcy and a 20-day drop dead provision after the Bankruptcy Case is dismissed.

10. Until the Creditor's Claim is paid in full, within ten (10) days of receipt, Debtor will pay Creditor 40% of any Future Income (as defined at paragraph d. on page 16 of the CSA, excluding gross W-2 wages from NanoPure, LLC (hereinafter referred to as "NanoPure"); such excluded gross wages not to exceed more than $20,000.00 per month, but also including repayment of loans/return of invested funds) related to either the sale of his 10% ownership in NanoPure or 40% of any monies paid to Debtor directly from NanoPure, excluding said gross W-2 wages, such excluded gross wages not to exceed $20,000.00 per month. *See* Dixon Hughes Report, at p. 2. This payment will be subject to a 30-day drop dead provision while the Debtor remains in bankruptcy and a 20-day drop dead provision after the Bankruptcy Case is dismissed.

11. Until the Creditor's Claim is paid in full, within ten (10) days of receipt, Debtor will pay Creditor 40% of any Future Income (as defined at paragraph d. on page 16 of the CSA but also including repayment of loans/return of invested funds) from Infinite Resource Solutions (together with NanoPure, GFS, and its subsidiaries, hereinafter collectively referred to as "Companies"). *See* Dixon Hughes Report, at p. 2. This payment will be subject to a 30-day drop dead provision while the Debtor remains in bankruptcy and a 20-day drop dead provision after the Bankruptcy Case is dismissed.

12. Creditor is still to receive a bonus payment up to $2,000,000.00 which commences if Debtor receives Future Income (as defined at paragraph d. on page 16 of the CSA) from any of his entities in excess of $8,550,000.00. Creditor will receive 17.5% of any Future Income up to a maximum of $2,000,000.00. Future Income shall be calculated beginning on the first day after Debtor has income of $8,550,000.00, such income to Debtor to be calculated beginning the first day after approval of the CSA (April 8, 2016) and continuing through and including December 31, 2024.

13. To ensure that the sale of any of Debtor's entities is fair and conducted in accordance with terms beneficial to all parties, within thirty (30) days after the execution of this Agreement, Debtor will provide a notice to each of the Companies referenced herein acknowledging that the Creditor has a lien on GFS with a copy of notice provided to Creditor's Counsel and Nelson Mullins.

5

14.  After the Bankruptcy is dismissed, any dispute over monies to be paid to Creditor in accordance with this Agreement shall be arbitrated as set forth at pp. 16-17 of the CSA, except for issues of non-payment, which may be enforced in the Family Court and/or in the Bankruptcy Court at the option of the Creditor.

15. The Debtor will pay the Creditor's Claim in full no later than the Maturity Date. All payments to the Creditor (excepting the $10,000.00 monthly payments) will be calculated net of any income tax due and payable to the IRS solely related to the funds received by Debtor, which amount of tax withheld is also subject to arbitration if the Bankruptcy Case is dismissed.  Any and all payments made to the Creditor will not be subject to federal or state taxes.

16. Until the Creditor's Claim is paid in full, the Debtor will direct the Companies referenced in this Agreement to provide all prepared financial and tax statements directly to Creditor and Creditor's Counsel within 30 days after completion.  Creditor and Creditor's Counsel will be provided direct communication with the Companies' representatives.  In the event Creditor is not paid in full by December 31, 2019, Debtor agrees to hire a third-party financial services company acceptable to Creditor (*e.g.* Dixon Hughes) to review for accuracy any prepared financial and tax statements of the Companies. After December 31, 2019, Creditor and Creditor's Counsel will be provided direct communication with the third-party accounting firms responsible for the financial information.  In addition, until the Creditor's Claim is paid in full, Creditor and Creditor's Counsel will be notified by said Companies of any distributions paid to Debtor; however, in the event Creditor is not paid in full by December 31, 2019, Creditor and Creditor's Counsel will be notified by a third-party accounting firm of any distributions paid to Debtor.  In addition, Debtor shall continue to provide Monthly Operating Reports and Quarterly Periodic Reports as per paragraph 4 of the Agreement until Creditor's claim is paid in full.

17. Debtor has the option to prepay the outstanding amount due prior to the Maturity Date. *See* Dixon Hughes Report, at p. 2.

18. The Creditor agrees to release any lien she has been given based upon liquidation and/or distribution from the respective asset, provided she is reasonably satisfied with the price being offered and the proposed distribution.  Any such release shall not be unreasonably withheld.  The mortgage on the John Galt Property shall be released by the Creditor only when the Creditor's Claim is paid in full.

19. The failure to make any payment due under the Agreement before the expiration of the applicable drop-dead provision constitutes an act of default.  The drop-dead provision means if the Debtor fails to make a payment on time, the Bankruptcy Case will be

converted to a Chapter 7. If default occurs outside of the Bankruptcy Case, then the Creditor will have access to the Family Court. The failure to pay Creditor's Claim in full by the Maturity Date constitutes an act of default.

20. Events that constitute acts of default will include, without limitation, failure to timely cure a delinquent payment within the 30-day drop dead provision while the Debtor remains in bankruptcy; failure to timely cure a delinquent payment within the 20-day drop dead provision after the Bankruptcy Case is dismissed; failure to pay Creditor's Claim in full by the Maturity Date; and the return of any payment for insufficient funds. In the event of any default that is not timely cured, the John Galt Property will immediately be placed on the market for sale with a realtor selected by the Creditor. The John Galt Property will be listed at a price recommended by the realtor and approved by Creditor and sold at a price approved by the Creditor. In the event of any default that is not timely cured, the sale of the Debtor's interests in GFS will be sold by public sale posted once a month for 3 months in a public forum (e.g. website of Terry Howe). The Debtor will be responsible for any and all attorney fees incurred by the Creditor for action taken as a result of a default. Furthermore, in the event of a default, the Debtor will not object to the appointment of a Federal Court Receiver. Nothing in this paragraph prohibits any and all remedies available to the Creditor in the event of the Debtor's default, to include such relief as may be awarded in the Family Court.

21. If either party is found by a court to be in default under any of the provisions of the Agreement, the defaulting party agrees to reimburse the non-defaulting party for all reasonable attorney's fees and associated legal costs related to prosecuting the default.

22. The Parties agree to revise the CSA to conform to this Agreement and to promptly seek approval of the revision by the Family Court. A copy of the revision is attached. The Debtor agrees to pay Creditor's Counsel's total billing not to exceed $2,000.00 for its participation in the preparation and execution of the modification of the CSA. Debtor will make such payment within thirty (30) days of presentation of Creditor's Counsel's fee statement following the complete execution of the revised CSA by both parties and their counsel.

23. The Parties agree to promptly move before the Bankruptcy Court to have this Agreement approved. During the time it will take to have the Agreement approved and until the Bankruptcy Case is dismissed, the Parties agree to jointly move to extend the time for filing a plan and disclosure statement for 90 days. If necessary, the Parties agree to file a second motion to have the plan and disclosure statement extended for 90 days.

7

24. Creditor agrees to dismiss with prejudice all contempt petitions filed in the Family Court pre-petition, and Debtor agrees to pay $10,000 as attorney fees to Creditor within 120 days after the Agreement has been approved by the Bankruptcy Court.

25. Debtor agrees to dismiss with prejudice the Petition for Rule to Show Cause that was filed in the Family Court on March 15, 2018.

26. Debtor and Creditor agree not to file any further petition in the Family Court that concern pre-petition contempt claims.

27. After the Agreement has been executed, the Debtor will remain in bankruptcy for 6 months. During that time, the Debtor may move the Bankruptcy Court to have the Bankruptcy Case dismissed and the Creditor will join in that Motion, provided that the order dismissing the Bankruptcy Case will not be entered prior to the 6-month period (except as stated herein below). Notwithstanding the above, Creditor agrees to allow Debtor to immediately file for dismissal upon Creditor's receipt of payment of $500,000, excluding any money received by the Creditor from the sale of the John Galt Property. The Debtor will only be permitted to move for dismissal of his Bankruptcy Case if the following conditions are satisfied:

    i. The various liens contemplated by this Agreement are in place, properly perfected, and enforceable;

    ii. The Debtor must have complied with all provisions of this Agreement at the time the dismissal is requested;

    iii. The revised CSA must be filed as an order of the Family Court; however, this provision is waived if, due to no fault of either Party, the Family Court has not filed an order approving the revision within six (6) months of the execution date of this Agreement.

    iv. Both parties agree not to file an appeal or motion to reconsider or to assert any other challenge with respect to the validity and/or legality of the Agreement or the revised CSA.

28. Once the Bankruptcy Case is dismissed, the Bankruptcy Court will retain jurisdiction to reopen the Bankruptcy Case and to enforce the Agreement until the Creditor's Claim is paid in full.

29. Neither party is bound by this Agreement as it relates to any post-petition actions.

30. If any term or clause of this Agreement is to any extent invalid, illegal, or incapable of being enforced, such term of clause shall be excluded to the extent of such invalidity, illegality or enforceability; all other terms and clauses shall remain in full force.

IN WITNESS WHEREOF, I have hereunto set my hand and seal this 2ℓ day of December 2018, 2018.

In the presence of:

_____
WITNESS #1

_____
FREDERICK SCOTT ALDERSON, DEBTOR

_____
WITNESS #2

In the presence of:

_____
WITNESS #1

_____
COLETTE WINTERS, CREDITOR

_____
WITNESS #2

9

STATE OF SOUTH CAROLINA    )           MODIFICATION OF
                                  )  COMPLETE SETTLEMENT AGREEMENT
COUNTY OF CHARLESTON      )

## PURSUANT TO SOUTH CAROLINA CODE SECTION 15-48-10, et. seq. – REQUIREMENT OF NOTICE – PORTIONS OF THIS AGREEMENT ARE SUBJECT TO BINDING ARBITRATION

THIS AGREEMENT is made and entered into this ____ day of December, 2018, by and between COLETTE WINTERS (herein "COLETTE" and formerly "Colette Alderson") and FREDERICK SCOTT ALDERSON (herein "SCOTT").

W I T N E S S E T H:

WHEREAS, COLETTE and SCOTT were married on August 17, 2002 and have three children together, namely EA, NA, and CA; and

WHEREAS, COLETTE and SCOTT separated on or about September 11, 2015; and

WHEREAS, incident to their separation, COLETTE and SCOTT entered into a Complete Settlement Agreement dated April 8, 2016, which was approved by Final Order Approving Complete Settlement Agreement and Ending Case filed on April 8, 2016 in Case Number 2015-DR-10-3734. Such Complete Settlement Agreement resolved all issues between them, except the issue of divorce and is attached hereto as **Exhibit A**; and

WHEREAS, the parties were divorced on November 18, 2016 in Case Number 2016-DR-10-3547; and

WHEREAS, the parties have previously memorialized two written amendments to their April 8, 2016 Complete Settlement Agreement, specifically the February 3, 2017 Amendment to Complete Settlement Agreement and the August 2, 2017 Amendment Two to Complete Settlement Agreement, both attached hereto as **Exhibit B**; and

WHEREAS, there is a pending modification action filed in Case Number 2018-DR-10-248 with regard to child-related matters; and

WHEREAS, certain payments are owed by SCOTT to COLETTE pursuant to the April 8, 2016 Complete Settlement Agreement, as amended; and

WHEREAS, SCOTT is presently in bankruptcy proceedings in Case Number 18-01358-JW in the Bankruptcy Court of the State of South Carolina, and the parties have entered into a written "Settlement Agreement," attached hereto as **Exhibit C**, outlining the method by which

1

CW                                             SA

SCOTT will pay amounts owed to COLETTE pursuant to the 2016 Complete Settlement Agreement as amended, which Settlement Agreement they intend to present for approval by the Bankruptcy Court; and

WHEREAS, COLETTE and SCOTT intend to and it is the purpose of the terms of this CSA Modification Agreement to amend the terms of the April 8, 2016 Complete Settlement Agreement (as amended) ("CSA") to provide for payment by SCOTT to COLETTE of a cumulative amount of $2,868,000.00 as the remaining payment due to her under the CSA as alimony and equitable division (excepting any monies that may become due from SCOTT to COLETTE as a percentage of Future Income as also set forth below at Article 3.2) and a cumulative amount of $76,000.00 to the children's 529 plans ($45,000.00 to EA's 529 plan, $27,500.00 to NA's plan, and $3,500.00 to CA's plan); and

WHEREAS, SCOTT is represented in the Family Court action by Anne Frances Bleecker, Esq. of The Bleecker Law Firm, LLC, and COLETTE is represented in the Family Court action by Marie-Louise Ramsdale, Esq. of Ramsdale Law Firm; and both Parties acknowledge that they have been competently and properly represented and advised, and believe that they have been fully advised of all of their rights and responsibilities hereunder; and

WHEREAS, the Parties hereto now consider it to be in their respective best interests to settle between themselves the financial issues contained herein and now wish to reduce their agreement to writing and desire that it shall constitute the total agreement as to the issues regarding the remaining payment owed by SCOTT to COLETTE for alimony, equitable division, and funding the children's college accounts pursuant to the terms of the CSA;

NOW, THEREFORE, in exchange for valuable consideration and mutual covenants and promises, the undersigned, COLETTE WINTERS and FREDERICK SCOTT ALDERSON, hereby covenant and agree to modify and supplement their April 8, 2006 Complete Settlement Agreement, as approved by the Final Order Approving Complete Settlement Agreement and Ending Case in Case Number 2015-DR-10-3734, and as previously amended, as follows:

## ARTICLE I
### INTENT TO BE BOUND BY AGREEMENT

1.1    The Parties mutually intend this CSA Modification Agreement to be a final disposition regarding the remaining alimony, equitable division, and children's college accounts funding payments owed by SCOTT to COLETTE pursuant to the CSA and intend that this CSA

2

CW                                                                                                    SA

Modification Agreement shall be binding upon the parties in any Family Court matter as a Stipulation between the parties and counsel pursuant to South Carolina Rule of Civil Procedure 43(k) and otherwise.

## ARTICLE II
## SURVIVAL OF TERMS OF APRIL 2016 AGREEMENT

2.1    The terms of the April 8, 2016 Complete Settlement Agreement, which were approved and made an Order of the Family Court by *Final Order Approving Complete Settlement Agreement and Ending Case* ("April 2016 Order") on April 8, 2016 in Case Number 2015-DR-10-3734 and which are not altered or amended pursuant to the below-outlined CSA Modification Agreement and which are not otherwise inconsistent therewith or otherwise modified by a subsequent order of the Family Court (for example, as a result of the pending custody case) shall remain in full force and effect.

## ARTICLE III
## AMENDMENT OF CSA

**3.1.**    **Schedule of Payments by SCOTT to COLETTE:**    Paragraphs II.B., IV.C.8.a. through IV.C.8.c. and VII.E. of the CSA shall be amended and restated as follows:

*SCOTT shall make payment to COLETTE of an amount of $2,984,000.00 over 42 months from the date SCOTT makes his first payment, in accordance with the specific terms of the Settlement Agreement attached hereto as Exhibit C and incorporated herein by reference. Such amount constitutes all alimony and equitable division payments which are still owed to COLETTE pursuant to the CSA (excepting contingent payments which were outlined in Paragraph IV.C.8.d. of the CSA and which are addressed herein below), $76,000.00 in contributions by SCOTT to the children's 529 plans, and a contribution of $40,000.00 toward COLETTE'S bankruptcy fees. Husband's alimony obligation to Wife shall not be modifiable as it is lump sum alimony. Further, Husband's alimony payment shall not be terminated by the subsequent remarriage or cohabitation of Wife or by the death of either Husband or wife, but shall inure to the benefit or obligation of each other's estates, heirs, and devisees respectively. The alimony shall not be taxable to Wife.*

*Further, as to the 529 accounts, unless both parties so agree, neither parent shall withdraw funds from these accounts except for post-high school educational costs of a minor child.*

3

**3.2    Schedule of Bonus Payment by SCOTT to COLETTE**: Paragraph IV.C.8.d. of the CSA shall be amended and restated as follows:

*In addition to the payments and consideration set forth above at Paragraphs IV.C.8.a.-8.c. inclusive and at paragraph II.B. (as to alimony) and in accordance with the specific terms of the Settlement Agreement attached hereto as **Exhibit C** and incorporated herein by reference, SCOTT agrees to pay to COLETTE 17.5% of any and all income distributed to him (in the form of dividends, interest, distributions, wages, etc.) from all of his private equity, venture capital, and other business venture related earnings (considered for these purposes as "Future Income") not to exceed in aggregate as to the amount paid to COLETTE an amount equal to Two Million Dollars ($2,000,000.00). "Future Income" includes payments of any kind made from any one entity/person to another entity in which SCOTT or a related party has any ownership interest. "Future Income" shall be calculated beginning on the first day after SCOTT has future income of $8,555,000.00, such income to SCOTT to begin to be calculated beginning on the first day after approval of the CSA (April 8, 2016) and continuing through and including December 31, 2024. If there is any discrepancy as to what constitutes "Future Income" to SCOTT or the amount of monies to be paid to COLETTE under this paragraph, the parties will submit the issue(s) to binding arbitration according to the procedure set forth at Section XIX. SCOTT agrees to make these Future Income payments within the same year that such income is earned and distributed to him or within thirty (30) days of any arbitration award, whichever is sooner. SCOTT shall provide COLETTE all documentation requested by Wife or her attorney related to proof of such Future Income including but not limited to tax returns, financial statements, general ledgers, bank records, loan documents, etc. on an annual basis.*

**3.3    Life Insurance Obligation by SCOTT**. Paragraph III.D. of the CSA shall be amended and restated as follows:

*Until SCOTT has paid COLETTE in full the amount of $2,984,000.00, pursuant to Paragraph 3.1 (herein above) of the parties' CSA Modification Agreement, SCOTT shall maintain, at his sole cost, an amount in life insurance with COLETTE as sole beneficiary equal to the remaining amount of such $2,984,000.00 SCOTT owes to COLETTE. At such time as SCOTT has paid COLETTE the $2,984,000.00 in full and until the parties' youngest minor child turns 23, SCOTT shall maintain, at his sole cost, an amount of $1,000,000.00 in life insurance with COLETTE as trustee for the parties' three children as equal beneficiaries. SCOTT shall not*

4

be permitted to borrow against the life insurance policy in place to meet the terms of the parties'
*CSA Modification Agreement. SCOTT shall provide to COLETTE written proof of the existence
of this life insurance and that the life insurance policy meets the terms herein within ten (10)
days of court approval of this CSA Modification Agreement. Also within ten (10) days of court
approval of this CSA Modification Agreement, SCOTT shall execute a release as required by the
insurance company that authorizes the insurance company to provide information to COLETTE
as follows:*

1.  *That the insurance company should contact COLETTE immediately should any
    premium payment on the policy be missed; and*

2.  *That the insurance company shall provide directly to COLETTE information
    regarding the policy as necessary to assure her that the policy is in force and meets
    the terms as set forth herein.*

*SCOTT shall not revoke this authorization and/or release to the insurance company for
any reason so long as he is required to carry life insurance pursuant to this CSA Modification
Agreement. Should SCOTT change policies at any time, he shall immediately notify COLETTE in
writing of the new policy and shall execute any additional necessary releases authorizing the
new policy carrier to provide the information to COLETTE as set forth above. COLETTE'S
ability to communicate with the insurance company does not absolve SCOTT of his responsibility
to provide COLETTE, upon reasonable request not to occur more than once per year, with
documentation that the life insurance policy is in force as required and meets the terms herein.*

**3.4    Note and Mortgage on Real Estate to Secure COLETTE'S Claim**. Paragraph
IV.C.1.a. of the CSA shall be amended and restated as follows:

*SCOTT shall issue a note and mortgage on the property located at 23 John Galt Way,
Mount Pleasant, South Carolina 29464 (hereinafter referred to as "John Galt Property") to
secure the full amount owed to COLETTE pursuant to this CSA Modification Agreement, and the
same shall be provided to Nelson Mullins within thirty (30) days of the parties' execution of the
bankruptcy Settlement Agreement and pursuant to the terms thereof. SCOTT shall not encumber
the John Galt Property until the $2,984,000.00 to be paid to COLETTE under this CSA
Modification Agreement is paid in full and shall warrant that the existing mortgage on the
property does not exceed $1,560,000.00 as of the date of the execution of the Settlement
Agreement.*

5

CW                                                                                    SA

**3.5** **All Holdings of Global Financial Services Consulting, LLC, and Lake Avenue Ventures, LLC (the "Businesses")**. Paragraph IV.C.6. of the CSA shall be amended and restated as follows:

*Except as may be subject to the lien in favor of COLETTE as referenced herein below, SCOTT shall have sole ownership of his interest in the Businesses, including all debts payable associated therewith. SCOTT shall be responsible for all liability and debt of whatever nature associated with his interest in the Businesses and shall hold Wife harmless therefrom and indemnify her thereto, to include as to all third-party claims. Until payment in full of the above-referenced $2,984,000.00 to COLETTE has been made by SCOTT, SCOTT shall provide COLETTE with a properly recorded and perfected lien on Global Financial Services Consulting LLC (hereinafter "GFS"). Such lien shall be signed within thirty (30) days of the execution of the bankruptcy Settlement Agreement by the parties and delivered to Nelson Mullins to be held in trust in accordance with the terms of the bankruptcy Settlement Agreement. SCOTT further agrees not to change the name or the ownership of GFS or transfer GFS's ownership in SJ Management LLC, Cloverlight LLC, Watertech Holdings LLC, and Select Ventures Fund I LLC without COLETTE'S approval. SCOTT agrees to provide notice to COLETTE and COLETTE'S counsel of any intent of SJ Management LLC, Cloverlight LLC, Watertech Holdings LLC, or Select Ventures Fund I LLC to transfer assets other than in the ordinary course of business within ten (10) days of the receipt of such notice.*

**ARTICLE IV**
**ATTORNEYS' FEES**

**4.1** *In accordance with the specific terms of the Settlement Agreement attached hereto as* **Exhibit C** *and incorporated herein by reference, SCOTT shall pay COLETTE'S counsel's total billing for its participation in the preparation and execution of this Modification of Complete Settlement Agreement, such amount not to exceed $2,000.00. SCOTT will make such payment within thirty (30) days of presentation of COLETTE'S attorney fee statement following the complete execution of this CSA Modification Agreement by both parties and their counsel.*

**ARTICLE V**
**DISCLOSURE AND UNDERSTANDING OF THE PARTIES**

6

CW                                                                 SA

5.1    Each of the Parties expressly certifies that each of them has entered into this CSA Modification Agreement voluntarily, after due consideration, and relying upon his or her independent judgment after consulting with separate counsel; and that consent to the execution of this CSA Modification Agreement has not been obtained by duress, fraud or the undue influence of any person.

5.2    The Parties acknowledge that they are entering into this CSA Modification Agreement freely and voluntarily; they have ascertained and weighed all the facts and circumstances likely to influence their judgment concerning this CSA Modification Agreement; each of them understands and has given consideration to all provisions of this CSA Modification Agreement; and no relief will be sought by either Party which is inconsistent with the terms of this Agreement;; and that with respect thereto there are no representations, warranties, promises, covenants or undertakings other than those expressly set forth herein.

## ARTICLE VI
## AGREEMENT TO BE SUBMITTED FOR COURT APPROVAL AND/OR TO OPERATE AS A STIPULATION PURSUANT TO S.C. RULE OF CIVIL PROCEDURE 43(k)

6.1    It is the intent of the parties to submit this CSA Modification to the Charleston County Family Court for approval and incorporation into a Court Order. If for any reason the Family Court declines to issue an Order incorporating the terms of this CSA Modification, this CSA Modification shall be filed in the Charleston County Family Court under Case Number 2015-DR-10-3734 as a Stipulation entered on the record pursuant to S.C. Rule of Civil Procedure 43(k). COLETTE and SCOTT further agree that this CSA Modification Agreement is a modification made between them to the CSA as permitted by Paragraphs XVII.D. and XVIII.B. of the CSA.

## ARTICLE VII
## GENERAL PROVISIONS

The Parties represent and further agree to the following:

7.1    Each Party acknowledges that he or she is fully informed as to his or her legal rights and obligations; that each of them has entered into and executed this Agreement after conferring with each of his own respective independent attorneys, and that they have had the opportunity to consult with independent accountants and other professionals. They acknowledge that each of them executes this CSA Modification Agreement freely and voluntarily, intending to

7

CW                                                                                          SA

be bound forever by it and intending that it shall be enforceable by the other Party in any proceeding in the Family Court of the State of South Carolina.

7.2    Each Party to this CSA Modification Agreement may apply to the Family Court of the State of South Carolina or such other courts as may achieve jurisdiction hereinafter, for an Order enforcing the terms and conditions hereof.

7.3    No waiver of any breach by either Party of the terms and conditions of the CSA Modification Agreement shall be binding upon either of the Parties unless reduced to writing and signed before a notary public.

7.4    This CSA Modification Agreement was duly executed and delivered in Charleston County, South Carolina, and its terms and conditions shall be governed by and interpreted under the laws of the State of South Carolina whenever and in whatever judicial forum adjudication of such interpretation or dispute may arise.

7.5    SCOTT and COLETTE expressly agree that, at any time hereafter, each of them shall make, execute and deliver any and all further and other instruments or papers or things as may be reasonably required or desirable for the purpose of giving full effect to this CSA Modification Agreement. Except where a specific period or time of performance is expressly set forth in this Agreement, all other acts shall be performed within thirty (30) days of request.

**IN WITNESS WHEREOF,** the Parties and their counsel have hereunto set their hands and seal on the date and year first shown above in this CSA Modification Agreement.


_____          _____
Frederick Scott Alderson                            Anne Frances Bleecker
                                                             Attorney for Frederick Scott Alderson

Sworn to before me this _____ day of_____, 2018.

_____
Notary Public for the State of South Carolina

My commission expires: _____


8

CW                                                                                            SA

_____          _____
Colette Winters                     Marie-Louise Ramsdale
                                    Attorney for Colette Winters

Sworn to before me this _____ day of_____, 2018

_____
Notary Public for the State of South Carolina

My commission expires: _____

9

CW                                                    SA

UNITED STATES BANKRUPTCY COURT

DISTRICT OF SOUTH CAROLINA

IN RE:                                    )
                                          )    B/K Case No.: 18-01358-JW
FREDERICK S. ALDERSON                     )
                                          )    Chapter 11
              Debtor.                     )
_____

## ORDER APPROVING SETTLEMENT
_____

THIS MATTER comes before the Court upon the Notice of Settlement reached between Frederick S. Alderson (the "Debtor") and Colette Winters f/k/a Colette Alderson (the "Creditor"). There were no objections to the Notice of Settlement.

The Court was advised that prior to the filing of this bankruptcy case the Debtor and the Creditor were involved in extensive Family Court litigation concerning alimony, maintenance, support, visitation, property settlement and other issues. Through subsequent discussions and negotiations the parties have agreed to resolve their issues on the terms and conditions set forth in the proposed Settlement Agreement, which was attached to the Notice of Settlement, the terms of which are incorporated herein by reference.

I find that this matter is properly before this Court and that there were no objections to this settlement. It is, therefore

ORDERED, ADJUDGED and DECREED that the Settlement reached between the Debtor and the Creditor is hereby approved on the terms and conditions set forth herein;

IT IS SO ORDERED!