**U.S. BANKRUPTCY COURT**
**District of South Carolina**

Case Number:  **20-00662-jw**

**ORDER AUTHORIZING THE SALE OF ASSETS OF THE DEBTOR FREE AND CLEAR OF LIENS, CLAIMS, ENCUMBRANCES, AND OTHER INTERESTS PURSUANT TO 11 U.S.C. § 363**

The relief set forth on the following pages, for a total of 38 pages including this page, is hereby ORDERED.

**FILED BY THE COURT**
**08/14/2020**



John E Waites

US Bankruptcy Judge
District of South Carolina

Entered: 08/14/2020

# UNITED STATES BANKRUPTCY COURT

# FOR THE DISTRICT OF SOUTH CAROLINA

IN RE:

Watertech Holdings, LLC,

Debtor.

C/A No. 20-00662-JW

Chapter 11

## ORDER AUTHORIZING THE SALE OF ASSETS OF THE DEBTOR FREE AND CLEAR OF LIENS, CLAIMS, ENCUMBRANCES, AND OTHER INTERESTS PURSUANT TO 11 U.S.C. § 363

THIS MATTER came before the Court for hearing on the motion (the "Sale Motion") of Watertech Holdings, LLC ("Debtor") for entry of an order authorizing the sale of substantially all of the Debtor's assets, including contract rights, causes of action, intellectual property, goodwill, and all documents and related rights ("Purchased Assets") pursuant to 11 U.S.C. § 363 filed on March 2, 2020. Copies of the Sale Motion, Notice of Hearing, and Consent Order Establishing Bidding and Other Procedures in Connection with the Sale of Debtor's Assets and Granting Protections to the Proposed Purchaser ("Bid Procedures Order") were served on all creditors, parties in interest, and all parties that had expressed an interest in purchasing the Debtor's assets pre-petition. An in-person hearing on the Debtor's Sale Motion was conducted on August 5, 2020 ("Sale Hearing") and following competitive bidding by the parties in attendance, this Court accepts the Debtor's recommendation of PureCycle, LLC ("PureCycle") pursuant to the terms of the Asset Purchase Agreement ("PureCycle APA"), which is incorporated by reference and attached hereto as **Exhibit A**.

After considering the Sale Motion, any and all responses and objections filed thereto, and the arguments and evidence presented by counsel at the hearing on the Sale Motion, including

1

stipulated evidence in the form of trial exhibits and the proffered testimony of Bob Fei and Steven

Gareleck, the Court makes the following findings of fact and conclusions of law:

## **FINDINGS OF FACT**[1]

### **Background**

1.      The Debtor filed its voluntary petition for relief under chapter 11 of the Bankruptcy

Code on February 6, 2020 (the "Petition Date"). The Debtor is operating its business and managing

its assets as a debtor in possession pursuant to §§ 1107(a) and 1108.

2.      The Debtor is a South Carolina Limited Liability Company with Bob Fei serving

as its manager and Keith Johnson serving as co-manager. The primary bidders at the sale hearing

were entities in which members or principals are also members or principals of NanoPure LLC

and/or related entities or the Debtor. Specifically, the stalking horse bidder, WT Asset Acquisition

Group, LLC is solely owned by Steven Gareleck, who owns a 10% interest in NanoPure, LLC.

PureCycle's member, David Pobiak, owns a 1% interest in NanoPure, LLC and a 1.75% interest

in the Debtor. The record reflects a number of present or former business or contractual

relationships between these parties and a recent breakdown in these relationships.

3.      As a matter of background, the Debtor in its filings provided a number of facts

regarding the history of the Debtor and its assets; however, the Court finds it unnecessary to

formally examine many of these representations because they are not central to the consideration

of the Sale Motion. Nevertheless, they are contained herein for context:

- The Debtor was formed on September 18, 2014 to develop products and disinfecting
  technologies, which led to the intellectual property rights obtained through an
  Exclusive Patent License Agreement between the Debtor and Battelle Memorial
  Institute ("Battelle"). The Debtor's License Agreement with Battelle is dated February
  16, 2015 (the "Battelle License"). The Debtor initially operated as Watertech

---

[1]      To the extent that any of the following findings of fact constitute conclusions of law, they are adopted as
such, and vice versa.

Equipment & Sales, LLC and developed technologies in the dispersion of nanoparticles through micro-aerosol and micro-bubble systems, and developed proficiencies in algae growth.

- The Debtor rapidly attracted investment as a startup due to the spread of the Ebola Virus and the attention that the virus attracted in the media and public consciousness. However, despite significant investment and some success in the laboratory, the Debtor was never able to bring products to market.

- In 2017, the membership of the Debtor lost faith in its then Manager and CEO, Glenn Barrett, as the Debtor became unable to support its operations.

4.      According to the Debtor, it previously entered into a series of transactions with the entity now known as Paerosol, which was been previously known as NanoPure, LLC, NebuPure Technologies, LLC, and GFS Mold, LLC (collectively, "NanoPure"), that transferred the Debtor's interest, through license and/or assignment, in the Battelle License to NanoPure.[2]

5.      There have been mutual disputes between the Debtor and NanoPure as to the performance under the contracts between them. The Debtor represented the following timeline regarding the Battelle License:

- **February 16, 2015,** the Debtor, then known as Watertech Equipment & Sales, LLC, obtained an exclusive patent license agreement from Battelle for micro-aerosol disinfecting technology. The Battelle License provides the Debtor the right to sublicense out the license with the consent of Battelle.

- **December 12, 2016**, the Debtor became Watertech Holdings, LLC.

- **March 31, 2017**, an exclusive patent sublicense agreement was executed between the Debtor and GFS Mold, LLC for the use of the micro-aerosol for mold remediation only.

- **April 21, 2017**, the Debtor indicates it owns a patent application title Aerosol Device (patent application # 15/494,217), not related to the Battelle license.

- **May 24, 2017**, the Debtor executes the first amendment to Exclusive Patent License Agreement with Battelle regarding the assignment and sublicensing of its license.

- **November 1, 2017**, the Debtor executed the Exclusive Patent Sublicense Agreement for all Intellectual Property (all Patents, Trade Secrets, the Battelle License, Aerosol Device, *et al.* related to the disinfection of pathogens on surfaces and in the air). The Debtor's grant to GFS Mold, LLC is exclusive, irrevocable and perpetual. The parties' rights can be assigned only with the other party's consent, and with Battelle's consent.

---

[2]      The Court is not certain if this statement is correct or contested by the parties outside of this proceeding.

- **November 13, 2017**, GFS Mold, LLC changes its name to NebuPure Technologies, LLC.

- **December 12, 2017**, executed on January 12, 2018, Battelle executes an Amended and Restated License Agreement # 527277, also referred to the Exclusive Patent License Agreement, in favor of NebuPure Technologies, LLC.

- **December 27, 2017**, the Debtor executed a consent form authorizing the transfer of the Battelle License from the Debtor to NebuPure Technologies, LLC.

- **January 24, 2018**, the Debtor and GFS Mold, LLC modified the terms of the Exclusive Patent Sublicense Agreement.

- **January 26, 2018**, NebuPure Technologies, LLC changes its name to NanoPure, LLC.

- **March 26, 2020**, NanoPure, LLC changed its name to Paerosol Group, LLC.[3]

6.     The Debtor's assets consist primarily of intellectual property rights, potential causes of action, trade dress, and goodwill.

7.     As of the Petition Date, the Debtor believes it owes roughly 32 of its third-party general unsecured claims the approximate amount of $1,156,000. The Debtor listed all of its trade vendors, including those that are not believed to have a claim, in its schedules for notice purposes.

8.     The Debtor also owes general unsecured debts to 10 members who made loans to the Debtor to cover operations totaling approximately $1,053,000. The claims of David Pobiak, a principal of PureCycle, are waived as an additional provision of PureCycle's bid for the purchase of the Debtor's assets.

### History of the Sale Process

9.     According to the Debtor's filings:

- Pre-petition, the Debtor's Manager in consultation with the other members began to explore sales and other restructuring options. In early 2018, the Debtor solicited bids from NanoPure and a company known as Barron Algae operated by Glenn Barrett, the Debtor's former manager, for all remaining assets. With term sheets from both NanoPure and Barron Algae for the purchase of all remaining assets, the Debtor organized a meeting of the members to seek approval of its asset sale on September 6,

---

[3]     The Court is not certain if the timing or the characterizations herein are correct or contested by the parties outside of this proceeding.

2018. The Debtor's members were unable to reach a majority decision, and the member meeting resulted in a stalemate.

- In early 2019, the Debtor marketed itself to entities known to have an interest in the Debtor's assets. Through this effort, the Debtor entered into a term sheet to sell its assets to Argus Group, LLC ("Argus Group") over the alternative offer of NanoPure. Argus Group failed to present the Debtor with an asset purchase agreement nor did Argus Group fund the earnest money proposed in its term sheet with the Debtor. The Debtor then turned to the alternative offer from NanoPure and entered into a term sheet for the sale of its remaining assets, subject to Bankruptcy Court approval under § 363. The Debtor held a membership meeting in November 2019 to inform its members of the terms with NanoPure and the intent to seek Bankruptcy Court approval of the sale. Pre-petition, in January 24, 2020, the Debtor signed its Asset Purchase Agreement with WT Asset Acquisition Group, LLC ("WAAG") and WAAG agreed to act as the Debtor's "Stalking Horse Bidder" in association with the Debtor's Sale Motion.

10.     The Debtor filed its petition for relief under chapter 11 of the Bankruptcy Code on February 6, 2020.

11.     The Debtor's Sale Motion, as filed on March 2, 2020, was initially supported by a pre-petition Asset Purchase Agreement (the "WAAG's Initial APA") with WT Asset Acquisition Group, LLC, or its assigns ("WAAG" or "Stalking Horse"), seeking a sale free and clear of liens, claims, and encumbrances pursuant to 11 U.S.C. § 363. The Sale Motion proposed a purchase price of $125,000, which consisted of $115,000 in cash upon closing and $10,000 of earnest money that was expended by the Debtor pre-petition in due diligence to maintain a patent application, and the post-closing payments from the assignment of five percent (5%) of the net-profit from Stalking Horse for a period of five (5) years not to exceed $250,000 as well as a proposal to waive certain creditor claims in the proposed amount of $976,200.

12.     WAAG is solely owned by Steven Gareleck ("Gareleck"). Gareleck has a 10% direct membership interest in NanoPure along with Scott Alderson ("Alderson") who has a 10% membership interest, David Stern ("Stern") with a 15% interest, and David Pobiak ("Pobiak") who has a 1% membership interest. Alderson has a 9% membership interest in the Debtor. Stern has a 4 – 6% membership in the Debtor. Pobiak has a 1.75% membership in the Debtor.

13.    Along with the Sale Motion, the Debtor filed a Motion for Order Establishing Bidding and Other Procedures in Connection with the Sale of Assets of the Debtor and Granting Protections to WAAG, its stalking horse bidder ("Bid Procedures Motion"). WAAG participated in the formation of the bidding procedures. Objections to the Debtor's Bid Procedures Motion were filed by the United States Trustee ("U.S. Trustee") [Docket No. 34]; Colette Winters [Docket No. 48]; Dennis Avery, Rick M. Crosby, Malcom Fages, and Kenneth Metzger [Docket No. 40].

14.    The objections of parties related to Bid Procedures were resolved by the Bid Procedures Order entered on April 15, 2020 [Docket No. 51]. Pursuant to the Bid Procedures Order, which referenced the January 24, 2020 APA, bids were to be submitted to the Debtor by June 26, 2020 and any bid from any persons or entity other than the Stalking Horse Bidder, WAAG, shall be treated as a qualifying bid (a "Qualified Competing Bidder" and a "Qualified Competing Bid"), only if the bid:

    a.  was in writing and accompanied by a redlined asset purchase agreement ("APA") outlining the changes from WAAG's APA;

    b.  contained terms and conditions that are the same, substantially similar, or more beneficial to the estate. This provision shall not be interpreted to prevent offers for a single parcel or group or groups of parcels;

    c.  was accompanied by a written acknowledgement and agreement that the terms of the bid are substantially similar in all material respects to WAAG's APA, except for the identity of the bidder and the Purchase Price, or shall specify how the bid is more beneficial to the estate;

    d.  exceeded the Purchase Price by at least Twenty-Five Thousand and no/100 ($25,000);

    e.  included satisfactory evidence of the financial ability of the Qualified Competing Bidder to timely consummate the purchase for cash; and

    f.  included a deposit of One Hundred Twenty-Five Thousand and no/100 ($125,000) in certified funds payable to the trust account of counsel for the Debtor.

15.    The Bid Procedures Order also clearly provided that "[t]he Court shall decide any dispute over what constitutes a 'Qualified Competing Bid,' and nothing in this Order shall be read to prohibit the Court from considering a higher or otherwise better bids on terms that differ from

the Debtor's proposed sale" as well as that "[a]ny dispute regarding any aspect of the foregoing

bidding procedures shall be resolved by the Bankruptcy Court."

16.     On June 26, 2020, the Debtor received the First Amended and Restated Asset

Purchase Agreement ("WAAG Amended APA") from WAAG. The WAAG Amended APA

removed claim waivers in the approximate amount of $801,000, removed payments from

contingent future profits of WAAG, and increased the cash closing price to $250,000. The WAAG

Amended APA was never approved by the Court and no amended order modifying the bid

procedures was entered by the Court. The Debtor also received an email expressing an intent to

bid from counsel for another entity, Argus Group, on or before July 1, 2020.

17.     On July 7, 2020 at the request of WAAG, the hearing scheduled on the Debtor's

Sale Motion was continued to August 5, 2020 in compliance with the COVID Restrictions found

in the Amended Standing Order entered Tuesday, May 19, 2020 by Chief District Judge R. Bryan

Harwell. Anticipating an additional possible bid from Argus Group, counsel for the Debtor,

WAAG and others agreed to an order continuing the sale hearing and permitting any additional

bids (subject to objection) or objections to the Sale Motion to be filed on or before July 8, 2020 at

10:30 A.M.

18.     The Debtor received a proposed Asset Purchase Agreement from Argus Group (the

"Argus Group APA") prior to 10:30 A.M. on July 8, 2020. Despite the language of the Argus

Group APA, the Argus Group APA was materially different from the WAAG Amended APA

based upon contingencies that it contained. The Argus Group APA was never supported by a

$125,000 earnest money deposit and the Argus Group APA was not compliant with the Bid

Procedures Order.

19.     On July 21, 2020, WAAG submitted a Second Amended and Restated Asset

Purchase Agreement ("Second Amended WAAG APA") for the primary purpose of describing the assets being purchased with greater specificity. The Second Amended WAAG APA was not approved by the Court, nor was the Bid Procedures Order amended. The Second Amended WAAG APA removed the waiver of the claim of David Pobiak in the amount of $175,000.

20.     On July 31, 2020, the Debtor received a proposed Asset Purchase Agreement from PureCycle, LLC (the "PureCycle APA") along with an earnest money deposit in the amount of $125,000. The PureCycle APA was non-contingent and identical to the Second Amended WAAG APA in all material respects, only modifying the name of the purchaser, the purchase price, and shortening the period between entry of the Sale Order and closing of the transaction with the Debtor. The PureCycle APA was not compliant with the Bid Procedures Order in terms of when it was received by the Debtor, but compliant with all other provisions and requirements.

**The Auction**

21.     On the morning of the Sale Hearing, counsel for WAAG filed an objection to the late filed bids of PureCycle and Argus Group.

22.     On August 5, 2020 at 1:00 PM, attorneys and business representatives for WAAG and PureCycle appeared at the Sale Hearing to bid. Argus Group did not participate at the Sale Hearing. WAAG presented its bid of $250,000 and PureCycle presented its bid of $275,000. Since the Debtor has insisted that the Stalking Horse bid be non-contingent, all cash, and an immediate closing and since the competing PureCycle bid met those same requirements, argument of counsel centered on the propriety of the Debtor accepting a bid after the deadline stated in the Bid Procedures Order. When the Court noted that a higher bid of $275,000 would merely cover the reimbursement due to the Stalking Horse, PureCycle raised its bid to $375,000.

23.     After consultation with WAAG and PureCycle, Debtor's counsel represented that

in keeping with the Debtor's fiduciary duties to estate creditors and the business judgment of the Debtor's management based upon the certainty of substantially higher offers in competitive bidding, it desired that the Court exercise its authority under the Bid Procedures Order to treat the PureCycle APA as a Qualified Competing Bid.

24.    The Court accepted the Debtor's exercise of its fiduciary duty and allowed the bidding to be reopened. After PureCycle increased its bid to $375,000 and waived Mr. Pobiak's creditor claim, WAAG increased its bid to $400,000 but chose not to waive any creditor claims associated with its bid.  Bidding concluded with a bid of $500,000 from WAAG, which was exceeded by a final bid from PureCycle of $525,000, plus the waiver of Mr. Pobiak's creditor claim. WAAG was given the opportunity to bid further but declined. WAAG also chose not to be recognized as a backup bidder in the event PureCycle failed to deposit further funds or timely close on its bid.

25.    The terms of the PureCycle bid included the following provisions:

- PureCycle agreed to pay an all cash purchase price of $525,000 (the "Purchase Price").
- The sale to PureCycle would be non-contingent and not subject to any further due diligence investigation.
- The claims of David Pobiak, a member of PureCycle, against the Debtor's Estate would be waived and receive no distribution.
- Funds sufficient to pay the Purchase Price would be placed in escrow with Debtor's counsel within 24 hours of the Sale Hearing.
- The closing of this sale would occur within ten (10) days of the entry of a final order not subject to appeal.

26.    The Debtor recommended the PureCycle bid in its exercise of its best business judgment and in the best interest of creditors.

### Sale Objections

27.    The U.S. Trustee's objection to Bid Procedures [Docket No. 34] also objected to

the Debtor's Sale Motion seeking further details regarding the Debtor's assets being sold, details regarding the connections of WAAG to NanoPure, and questioned the appropriateness and validity of any post-closing payments and claim waivers that were included as terms of the WAAG's Initial APA.

28.     Ms. Winters also objected to the Sale Motion to the extent that she had not consented to any waiver of claims belonging to GFS Mold, LLC, in which she had an interest through her divorce settlement with Mr. Alderson. Additionally, Ms. Winters argued that the transaction proposed by the Sale Motion was not negotiated at arm's length.

29.     Objections as to the Sale Motion filed by the U.S. Trustee and Ms. Winters were resolved through the stipulation of exhibits and the proffer of testimony of Bob Fei and Steven Gareleck, read into the record by Debtor's Counsel at the Sale Hearing.

30.     It was agreed that payment to WAAG on the reimbursement of expenses would be paid only after submission of those expenses by WAAG and approval by the Court. Return of WAAG's earnest money deposit would be made upon this order becoming a final order.

31.     The Debtor asserted that the terms and conditions of the proposed sale are fair, reasonable and appropriate and were reached after arms-length negotiations and bargaining between the Debtor and PureCycle. The structure of the bid terms and procedures were based on those established with the consent and participation of WAAG.

32.     Based upon the foregoing, the Debtor determined in the exercise of its business judgment that the bid of PureCycle is the highest and best bid for the Debtor's assets and is fair and reasonable. The Debtor determined in its business judgment that acceptance of the PureCycle Bid is in the best interest of the Debtor's estate and all of its creditors.

33.     The Debtor proposed that proceeds of the sale be held pending further order of the

Court or until confirmation of the Debtor's Plan of Liquidation.

34.    Before entry of this Order, Debtor's counsel represented that all funds necessary to close the PureCycle APA are being held in his firm's trust account.

## CONCLUSIONS OF LAW

### I.    Qualifications for Bidders

On August 4, 2020, the Debtor filed the Second Amended Bidding Report, which included the bid of PureCycle, and on August 5, 2020, WAAG filed an objection to that bid on the grounds that it was presented late and submitted in bad faith.

The Court entered the Bid Procedures Order on April 15, 2020, which provided that a bid must be received by Debtor's and WAAG's counsel by no later than the close of business on June 26, 2020 and setting a sale hearing for July 8, 2020. As a result of one of the attorneys involved in this matter being required to quarantine due to possible exposure to COVID-19, the Court, after a conference call with counsel for the parties and at the request of counsel, continued the sale hearing to August 5, 2020 and extended the date to submit bids to July 8, 2020 as indicated in the Order Continuing Sale Hearing entered on July 7, 2020

Importantly, the Bid Procedures Order provided the Court with the ultimate authority and discretion regarding the proposed sale of the Debtor's assets.[4] Specifically, the Bid Procedures Order provided that "[t]he Court shall decide any dispute over what constitutes a 'Qualified Competing Bid,' and **nothing in this Order shall be read to prohibit the Court from**

---

[4]    For more than twenty years, orders for bidding procedures have been employed by bankruptcy courts in this District to facilitate an organized process allowing the Court and parties to quickly ascertain the bona fides of a bidder and whether competing bids are substantially similar, or whether there are material differences between the competing offers. *See In re Martin Color Fi, Inc.*, C/A No. 98-10145-W, slip op. (Bankr. D.S.C. May 18, 2000). There is no requirement under the Bankruptcy Code, Federal Rules of Bankruptcy Procedure, or the South Carolina Local Bankruptcy Rules that a bidding procedure order be employed in connection with a sale under § 363 of the Bankruptcy Code.

**considering a higher or otherwise better bids on terms that differ from the Debtor's proposed sale.**" (emphasis added). Further, the Bid Procedures Order provided that "[a]ny dispute regarding any aspect of the foregoing bidding procedures shall be resolved by the Bankruptcy Court." Those provisions were not changed by any amendment of an applicable APA or the entry of the order continuing the Sale Hearing.

This language of the Bid Procedures Order mirrors the well-accepted principle that "a bankruptcy court is generally afforded wide latitude in deciding whether to grant or deny approval of estate asset sales." *In re Bakalis*, 220 B.R. 525 (Bankr. E.D.N.Y. 1998); *see also Reid v. King*, 157 F.2d 868 (4th Cir. 1946) (noting that when a sale is subject to the confirmation of the court, the decision whether the sale shall be confirmed is in the sound discretion of the court). While the recommendation and judgment of the debtor-in-possession is given discretion and deference, a court may interfere in such matters as § 363 sales "'for the purposes of safeguarding the interest of parties concerned, such as creditors and bidders.'" *Id.* (quoting *In re Blue Coal Corp.*, 59 B.R. 157, 163 (Bankr. M.D. Pa. 1986)). For example, "a Bankruptcy Court . . . does have the power to disapprove a proposed sale recommended by a trustee or debtor-in-possession if it has an awareness there is another proposal in hand which, from the estate's point of view, is better or more acceptable." *In re Broadmoor Place, Inv., L.P.*, 994 F.2d 744, 746 (10th Cir. 1993); *see also In re Sunland, Inc.*, 507 B.R. 753 (Bankr. D.N.M. 2014) (reopening bidding to consider a late bid that was approximately 20% higher than any other bid); *In re Muscongus Bay Co.*, 597 F.2d 211 (1st Cir. 1979) (affirming a bankruptcy court's decision to consider a late bid that was approximately 20% higher than the only timely bid submitted); *In re Food Barn Stores, Inc.*, 107 F.3d 558 (8th Cir. 1997) (affirming a bankruptcy court's decision to consider a late bid that was approximately 31% higher than the highest timely bid); *In re GGSI Liquidation, Inc.*, 280 B.R.

425 (N.D. Ill. 2002), aff'd 368 F.3d 761 (7th Cir. 2004)(finding a bankruptcy court did not abuse

its discretion when it consider a late bid that was 16% higher than the winning bid at auction).

The Court first notes that in considering whether to permit the late bid, the Court has not

yet entered an order approving the Debtor's sale of its assets. Further, the debtor-in-possession, in

its fiduciary capacities to the bankruptcy estate, recommends the Court accept PureCycle's highest

bid of $525,000 plus a claim waiver, which is more than double WAAG's stalking horse bid under

its Second Amended APA. The Court notes that as part of the Bid Procedures Order, WAAG,

acting as the stalking horse bidder, requested and was permitted reimbursement for the fees it

incurred for due diligence if it was outbid, which evidenced that WAAG had contemplated the

possibility of competitive bidding and being outbid as part of the sales process.

Further, when the Court indicated that it would hear competitive bids for the Sale Assets,

WAAG participated in the competitive bidding without a reservation of rights, and therefore,

appeared to waive any objection it had or consented to allowing competitive bidding. At the

hearing, WAAG did not request a delay or continuation of the competitive bidding process to

obtain further bidding authority or determine additional funding ability. Ultimately, upon the

conclusion of the competitive bidding, WAAG declined to serve as a backup bidder to PureCycle.

While WAAG requests the Court to strictly adhere to the deadline in the sale procedures

as set forth in the Bid Procedures Order, the Court cannot disregard that the actions of WAAG

itself differed from the terms set forth in that Order. Specifically, the Bid Procedures Order

provided that WAAG's stalking horse bid as represented by the initial Asset Purchase Agreement

would be $125,000 with a waiver of almost $1 million of claims against the Debtor and a 5%

assignment from WAAG of its net profits for a five-year period (up to $250,000). WAAG's Initial

APA was attached to the Bid Procedures Order as an exhibit and was used to define what was a

"Qualified Competing Bid" under the bidding procedures of that Order. However, the Debtor and WAAG amended the Initial APA without Court approval to provide for a purchase price of $250,000, while also removing the waiver of certain claims and the assignment of net profits. This amendment materially altered the purchase price without Court approval and, depending upon the final total of all other allowed claims, may have reduced that price by the elimination of the waiver of large claims and assignment of future net profits. The Bid Procedures Order was not amended to reflect the new APA terms. WAAG's amendment of the APA without Court authority made strict adherence to the Bid Procedures Order impractical.

The Court further notes that this is not a situation where the late bidder is proposing significantly different terms from the bid of the stalking horse. PureCycle's bid is identical to the form and substance of WAAG's amended bid, but with a $525,000 purchase price and an additional waiver of approximately $300,000 in claims owed by the Debtor. The mere difference is that PureCycle's bid was submitted after the deadline and in an amount greater than that proposed by the stalking horse bidder.

The Court recognizes the careful balance between reliance on established bidding procedures and the ultimate goal of maximizing the value of the estate for the payment to a debtor's creditors. A bid deadline is often beneficial to promote finality to the bidding process, especially in the typical case where time is of the essence or the asset's value is threatened by the lapse of time. However, in this case, neither PureCycle nor WAAG indicated that time was of the essence for their use of the assets as both view the property being sold as intangibles with the value to them that is not immediate, but in the future.[5]

---

[5]       For example, in the joint statement of dispute filed on July 6, 2020, WAAG's belief was that the fair market value of the assets is less than $250,000, indicating that "[i]t should be clear that the Stalking Horse does not believe that the fair market value of the limited assets held by the Debtor are worth $250,000. The Debtor's assets constitute several ambiguous claims, several uncertain rights, several disputed matters and a number of items of little value to

In the present matter, in addition to the express provisions of the Bid Procedures Order allowing the Court to accept the highest and best bid, the additional value to the estate created by PureCycle's bid heavily favors the Court accepting its late bid. If the Court were to decline PureCycle the opportunity to bid, the estate would be left with WAAG's $250,000 bid, a price that grossly undervalues the sale assets.[6] As a result of accepting PureCycle's bid and the competitive bidding that occurred thereafter, the purchase price for the sale assets more than doubled, which will undoubtedly create a higher dividend for the Debtor's unsecured creditors. For these reasons, the Court finds it is appropriate under these circumstances to accept PureCycle's bid as a Qualified Competing Bid, and therefore, the Court overrules WAAG's objection to PureCycle's bid as being too late.

## II.    The Sale

Section 363(b) of the Bankruptcy Code authorizes the Debtor to sell property of the estate outside the ordinary course of business after notice and a hearing. Such property can be sold free and clear of any interest in the property if each party holding such an interest consents. 11 U.S.C. § 363(f). Sales of property under § 363(f) are limited to sales of property of the estate. *In re Taylor*, 198 B.R. 142, 158 (Bankr. D.S.C. 1996). In the present case, the Purchased Assets are owned by the Debtor, and due to the lack of or resolution of any objection, it appears that its creditors consented to this sale.

The Debtor seeks the Court's authorization to sell the Purchased Assets pursuant to § 363(b)(1) and (f), outside the ordinary course of business, at or prior to a hearing on confirmation

---

Debtor or to the Stalking Horse." WAAG also indicated that its sole owner, Mr. Gareleck, believes "that . . . the assets he is purchasing are worth far less than $250,000 but, because he is uniquely situated, and he is willing to pay this amount out of a sense of fairness . . . ."

[6]      Due to the apparent value of the sale assets, the Court would not permit a preconfirmation sale of the assets at a purchase price of $250,000 at this time and would deny an order approving sale based upon WAAG's amended stalking horse bid in that limited amount.

of its plan of liquidation. This Court has recognized that when a sound business justification exists, it may authorize a sale pursuant to § 363(b)(1) without a confirmed plan of reorganization. *In re Taylor*, 198 B.R. 142, 156-157 (Bankr. D.S.C. 1996); *see also Stephens Indus., Inc. v. McClung*, 789 F.2d 386 (6th Cir. 1986); *In re WBQ Partnership*, 189 B.R. 97 (Bankr. E.D. Va. 1995).

Under the sound business purpose test, the Debtor has the burden of proving that:

a.  sound business reason or emergency justifies a pre-confirmation sale;

b.  the sale has been proposed in good faith;

c.  adequate and reasonable notice of the sale has been provided to interested parties; and

d.  the purchase price is fair and reasonable.

*See In re Taylor*, 198 B.R. at 157.

In this case, the U.S. Trustee had expressed concerns through an objection to the sale. After completing a thorough examination of the sale terms, assets and parties' relationships, the U.S. Trustee withdrew its objection and indicated that it felt that notice of the sale was adequate to generate interested buyers.

### A.    **Sound Business Reason or Emergency**

In the present case, sound business judgment warrants the sale of the Purchased Assets at or prior to confirmation of the Debtor's Plan. The Debtor represents that it operates in the emerging technologies industry and is unable to sustain its patent applications over a long period of time under its current business model. As shown by the Membership Loans made to enable the Debtor to continue operating, the Debtor's revenues are not sufficient to cover its costs. A preconfirmation sale not only would reduce the costs to the estate but, given the presently interested bidders, would preserve the assets' value for the Debtor's creditors.

B.      **Good Faith**

The Court finds that the terms and conditions of the proposed sale are fair, reasonable and appropriate and were reached after arms-length negotiations and bargaining between the Debtor's management and professionals and the potential bidders, including representatives of the PureCycle. The Debtor sought third-party purchase offers pre-petition and submitted this sale to advertisement and competitive bidding over a post-petition period of approximately 112 days prior to the auction and Sale Hearing. The results of the bidding process appear to have produced a significant dividend for the Debtor's allowed claimants. Therefore, the Court finds the sale was proposed in good faith.

C.      **Notice**

All creditors and parties in interest, including those parties who may have expressed an interest in purchasing the Purchased Assets or those that the Debtor contacted in that regard pre-petition, were served a copy of the Sale Motion and the Bid Procedures Order. Also, the Debtor held a series of pre-petition member meetings in which the Debtor notified its members of its intention to file this bankruptcy and propose approval of this sale. The Debtor expended significant efforts to market its business and assets pre-petition, and has advertised this proposed sale at length post-petition. Any potential purchaser was afforded the opportunity to view the due diligence materials, subject to the execution of a confidentiality agreement where appropriate. The U.S. Trustee expressed satisfaction with the degree and nature of the sale notice. Based upon the foregoing, the Court finds that notice is adequate and reasonable.

D.      **Purchase Price**

The Court finds that the Purchase Price of $525,000 (plus the waiver of Pobiak's claims) is reasonable and fair and currently represents the highest and best recovery for the Debtor and its

creditors. Prior to receiving an APA from PureCycle, the Debtor worked diligently to locate a purchaser for the business. The sale of the Purchased Assets was subject to higher or otherwise better competing offers under fair procedures subject to approval by this Court, and PureCycle's offer was the highest and best offer. Based upon the foregoing, the Court finds that the sale to PureCycle is in the best interests of the estate and its creditors.

### III.    Good Faith Purchaser

WAAG, in its objection to PureCycle's bid, alleged that PureCycle was not acting in good faith by bidding on the property, alleging that the manager of PureCycle, David Pobiak, received confidential information about WAAG's bid and financial circumstances as part of his relationship with another company, NanoPure LLC. Specifically, WAAG asserts Mr. Pobiak received confidential information about the sale through discussions with other members of NanoPure LLC, who are also principals in WAAG as well as part of his discussion with members of WAAG regarding waiving his claim as part of WAAG's bid. Specifically, WAAG asserts Mr. Pobiak violated confidentiality and non-disclosure agreements with NanoPure, LLC.

"Although the Bankruptcy Code does not define 'good faith purchaser,' [the Fourth Circuit] adopt[s] the traditional equitable definition that has been adopted by various courts of appeal: 'one who purchases the assets for value, in good faith, and without notice of adverse claims.'" *Willemain v. Kivitz*, 764 F.2d 1019, 1023 (4th Cir. 1985) (quoting *In re Rock Indus. Machinery Corp.*, 572 F.2d 1195, 1197 (7th Cir. 1978)). In determining a challenge to a purchaser's good faith status, the Fourth Circuit has indicated that "'[t]ypically the misconduct that would destroy a purchaser's good faith status at a judicial sale involves fraud, collusion between the purchaser and other bidders or the trustee, or an attempt to take grossly unfair

advantage of other bidders.'" *Id.* (quoting *Rock Indus.*, 572 F.2d at 1198)). There have been no allegations of any fraud or collusion between bidders or the Debtor.

In addressing this issue, the Court first notes the complicated and apparently contentious relationship between certain principals and members of WAAG and PureCycle, despite their joint participation in NanoPure. The Court was informed that litigation is pending in other courts between these parties and/or related entities. Nevertheless, neither NanoPure nor any of the related entities indicated in the pleadings were parties to the sales process, and the fact that the principals within the bidding entities have antagonistic relationships should not be a distraction from the ultimate goal in this case—to sell the Debtor's assets in a fair manner for the best price for the benefit of creditors. Considering the limited time allowed for the auction, the Court declined to consider "he said, she said" type testimony as a means of airing mutual grievances between the principals of the bidding parties.

The very role and value of a stalking horse bidder is to indicate to others that the assets being sold have value—at least in the eyes of the stalking horse bidder. It is this expression of value that is intended to attract other buyers to a competitive bidding process. Likewise, a stalking horse should expect that it may be outbid. It is for this reason that a stalking horse negotiates buyer protections, such as the reimbursement provisions contained in the APAs for WAAG in this case.

The fact that PureCycle's knowledge or interest in bidding and allegedly, even the likely limit of WAAG's bid, was apparently learned from voluntary disclosures made by the principals of WAAG does not appear to constitute an attempt to take grossly unfair advantage of WAAG or other bidders. It is noteworthy that WAAG previously stated to the Court that "it should be clear that the Stalking Horse does not believe that the fair market value of the limited assets held by the Debtor are worth $250,000" and that Mr. Gareleck, believes "that . . . the assets he is purchasing

are worth far less than $250,000 but, because he is uniquely situated, and he is willing to pay this amount out of a sense of fairness"—all the while holding and sharing with others an intention to bid up to $500,000.

Further, the alleged confidentially and nondisclosure agreements are with NanoPure and/or its subsidiary, entities that are not parties to this proceeding and were otherwise not represented at the Sale Hearing. In addition, despite being offered the opportunity to present exhibits on this issue at the hearing, including copies of the confidentiality and non-disclosure agreements in question, WAAG chose not to submit the exhibits into the record. For all of these reasons, the Court finds that PureCycle's actions do not constitute "an attempt to take grossly unfair advantage of other bidders."

Finally, the Court again emphasizes the fact that PureCycle's bid, while late, was identical to the form and substance of WAAG's amended stalking horse bid but for the purchase price and the addition of a waiver of Mr. Pobiak's claim.  There was no apparent attempt to mislead the Debtor or the Court and the Debtor stated at the hearing its belief that PureCycle was a good faith purchaser for value. It is not the Court's role to examine the motives for, or even the wisdom in, the bids offered for assets to be sold at a bankruptcy sale. Considering all of the circumstances of this case, the Court finds PureCycle is a good faith purchaser entitled to the protections afforded to sale transactions under § 363(m). For these reasons, WAAG's objection based upon PureCycle's alleged lack of good faith is overruled.

## **CONCLUSION**

Based upon the foregoing findings and conclusions, the Court finds that the sound business purpose test to authorize this preconfirmation sale has been met. It is hereby **ORDERED** that:

A.      The Sale Motion is GRANTED, and the Debtor is authorized to proceed with the

closing of the Sale of the Purchased Assets to PureCycle in accordance with the terms of this Order

and the terms of the applicable APA.

B.      The Debtor shall hold all sale proceeds pending confirmation of the Debtor's Plan

or further order(s) of the Court.

C.      The terms and conditions of, and the transactions contemplated by, the applicable

APA, are hereby approved in all respects; the sale and all related transactions contemplated thereby

are hereby approved, authorized and directed under § 363. To the extent a conflict arises between

the Sale Motion, the PureCycle APA, or any other documents related to the sale of the Purchased

Assets, and this Order, this Order shall control.

D.      Pursuant to § 363(b), the Debtor is hereby authorized, directed and empowered to

fully assume, perform under, consummate and implement the PureCycle APA together with all

additional instruments and documents that may be reasonably necessary and desirable to

implement the APA and the related transactions contemplated thereby, and to take all further

actions as may be reasonably requested for the purpose of assigning, transferring, granting,

conveying and conferring the Purchased Assets to PureCycle, or otherwise as may be appropriate

to the performance to the Debtor's obligations as contemplated by the PureCycle APA.

E.      Except as, and unless, expressly provided or exempted in the Sale Motion, the

PureCycle APA or this Order, PureCycle shall not be liable for any further claims, debts, liabilities

or obligations of the Debtor whatsoever, whether known or unknown, foreseeable or

unforeseeable, contingent, fixed, liquidated, unliquidated or otherwise.

F.      The sale of the Purchased Assets shall be free and clear of liens, claims, interests

and encumbrances pursuant to § 363(f), and PureCycle shall have no responsibility with respect to

such liens, claims, interests or encumbrances, whether legal, equitable or possessory, other than

those being expressly assumed by PureCycle. Upon the closing of the sale contemplated herein, the Debtor shall have no further claim in or to any of the Purchased Assets being transferred to PureCycle.

G.     PureCycle is a third-party purchaser and is not a successor in interest to the Debtor. PureCycle shall have no liability, including, without limitation, as a successor in interest or a successor entity, for any debts, claims or obligations of the Debtor arising prior to the date of closing of the purchase of the Purchased Assets, except as specifically set forth in the PureCycle APA and this Order.

H.     PureCycle is a good faith purchaser for purposes of § 363(m) of the Bankruptcy Code. PureCycle is hereby found to have acted in good faith within the meaning of § 363(m) of the Bankruptcy Code at all times through the entry of this Order and is entitled to the protections of § 363(m).

I.     Due to the possibility that unrelated litigation and business conflicts between the parties may unfairly delay the sale of assets to the detriment of the bankruptcy estate and upon the request of the Debtor, the stay of orders authorizing the use, sale or lease of property, as provided for under Rule 6004(h) of the Federal Rules of Bankruptcy Procedure, shall not apply to this Order, and this order shall be effective and enforceable immediately upon its entry.

J.     A reasonable opportunity to object or to be heard with respect to the relief requested and the Sale Motion was afforded to all interested parties and entities, including all third parties asserting interests and claims in, to or against the Purchased Assets.

**AND IT IS SO ORDERED.**

Columbia, South Carolina
August 14, 2020

# EXHIBIT A

| | | |
|---|---|---|
| **STATE OF SOUTH CAROLINA** | ) | |
| | ) | **ASSET PURCHASE AGREEMENT** |
| **COUNTY OF CHARLESTON** | ) | |

**THIS ASSET PURCHASE AGREEMENT** (the "**Agreement**") is made and entered into, on June 25, 2020 (the "**Modification Date**"), by and between Watertech Holdings, LLC (f/k/a Watertech Equipment and Sales, LLC), a South Carolina limited liability company ("**Watertech**" and/or the "**Seller**"), and Purecycle LLC, a Florida limited liability company (the "**Buyer**"). The Seller/Watertech and the Buyer are referred to herein each individually as a "**Party**" and collectively as the "**Parties**".

## R – E – C – I – T – A – L – S

**WHEREAS**, Watertech was formerly engaged in various commercial concerns and owns certain assets incidental thereto (as more particularly described and set forth herein) all under the business and tradename "Watertech" (such business and assets are collectively referred to herein as the "**Business**"); and

**WHEREAS**, Watertech has filed a Chapter 11 case (the "**Case**") in the U.S. Bankruptcy Court for the District of South Carolina (the "**Court**") (Case No. 20-00662-jw) under 11 U.S.C. Section 101, et seq. (the "**Code**"), and wishes, thereby, to sell and transfer all of its right, title and interest in and to the Business and the Assets, as expressly defined herein below, free and clear of all liens, claims or interests pursuant to a final and unappealable Order of the U.S. Bankruptcy Court ("**Order**") under Section 363 of the Code (the "**Sale**"); and

**NOW THEREFORE, BY THESE PRESENTS**, in consideration of the premises set forth herein above and the mutual covenants and promises of the Parties set forth herein below, and for other good and valuable consideration, the receipt and sufficiency of which is hereby acknowledged, the Parties hereby agree as follows:

Purchase and Sale of Assets. Subject to the terms and conditions contained herein, the Seller hereby sells, assigns, transfers, conveys and delivers to Buyer, and the Buyer hereby purchases from the Seller, all of Seller's collective or individual rights, titles and/or interests in and to the all of its "**Assets**" in the Sellers possession on the Closing Date **UNLESS** expressly excluded in this Agreement or pursuant to the Buyer's Exclusion Right, as set forth herein, including but not necessarily limited to:

    **(a)**    All that certain tangible and intangible personal property used by the Seller in the conduct of the Business, to be described further at a later date; and

    **(b)**    All right, title, and interest in and to any of Seller's designs, schematics, inventions, patents, trademarks, source code, software, applications, electronics, equipment, supplies, machinery or other assets used to conduct the Business, to be described further at a later date; and

    **(c)**    All codebase/software incidental or related to, and all other content relate to the Business, including without limitation environmental and hazard remediation technology details, marketing collateral, lists, customer lists, customer leads, infrastructure accounts, or any other information and/or assets determined by Buyer to be necessary or required to operate the Business as of the Closing Date, in each case as same exists on and as of the Closing Date; and

**(d)**     All accounts receivable of Seller and the Business in existence on and as of the Closing Date (the "**Watertech A/R**"); and

**(e)**     Any and all goodwill associated with the Business and/or the Assets (collectively, the "**Goodwill**"); and

**(f)**     All right, title, and interest in and to Seller's trade and business names and logos for or relating to the Business, including without limitation any actual formal trademark filings or registrations with the U.S. Patent and Trademark office and any common law trademarks or tradedress, to be described further at a later date (collectively, the "**Tradedress**"); and

**(g)**     All right, title, and claim in and to Seller's intellectual property used for, in or in any way relating to the Business, including without limitation any actual formal patent filings or registrations with the U.S. Patent and Trademark office, including, to be described further at a later date (collectively, the "**Technology IP**" and the Technology IP and the Intellectual Property are collectively referred to herein as the "**Intellectual Property**").

**(h)**     All right, title, interest and/or claim in or to that certain 5% profit-share vested in Watertech by NanoPure, LLC that resulted from the full and final transfer of that certain exclusive license from the Battelle Memorial Institute, having a place of business in Richland, Washington (the "**Battelle License**") to NanoPure, LLC (the "**Battelle Profit-Share**"); and

**(i)**     All right, title, interest and/or claim in or to any consideration owed or profit-share (if any) other than the Battelle Profit-Share, under that certain Exclusive Patent Sublicense Agreement dated October 31, 2017, as amended from time-to-time; and

**(j)**     All right, title and interest in and to the Watertech telephone numbers; the Watertech internet website domains, and domain specific email addresses, and the accounts related thereto, used in the Business, to be described further at a later date (collectively, the "**Telephone and Internet Assets**"); and

**(k)**     All business records, books and data in the possession of or used by Seller in the Business, including customer files, customer lists, correspondence with customers and account histories, sales literature and promotional or other material, and documents relating to the Intellectual Property, applications, code, software, materials, supplies and services; and

**(l)**     Those matters on the attached Exhibit 1; and

**(m)**     Notwithstanding anything to the contrary contained herein, any and all properties and claims without exception unless specifically excluded herein.

Transfer of the Seller's collective rights, titles and interests in and to the Assets shall be pursuant to a bill of sale which shall be executed and delivered on the Closing Date.

**2.**     Excluded Assets. Notwithstanding the foregoing, the following assets shall be excluded from the Assets, and shall be retained by the Seller from and after the Closing Date (collectively, the "**Excluded Assets**"): cash and cash equivalents held by, or held in the bank accounts of, the Seller as of the Closing Date. Any causes of action under Chapter 5 of the Bankruptcy Code.

**3.**     Liabilities.

(a)   <u>No Assumption of Liabilities</u>. Save and except for the Post-Closing Business Obligations (if any) to be described further at a later date, the Seller expressly acknowledges and agrees that the Buyer does not assume and does not agree to assume, and hereby disclaims all liability or obligation for, any and all liabilities or obligations of Seller, whether direct or indirect, known or unknown, absolute or contingent, of any type or nature whatsoever, including but not limited to the following liabilities (all, collectively, the "**Excluded Liabilities**"):

(i)    any claim, liability or obligation for breach or default of any of the contracts of the Seller or the Business, except for the Post-Closing Business Obligations; and

(ii)   any other obligations or liabilities of Seller or the Business, of any type or nature whatsoever, including without limitation those which pertain or relate to: (A) assets other than the Assets; (B) liabilities of Seller other than those included in the Post-Closing Business Obligations; (C) any business operations of Seller prior to the Closing Date (including without limitation operations relating to the Business); and (D) any non-Business operations of Seller at any time prior to or after the Closing Date; and

(iii)  any foreign, federal, state, county or local income, excise, withholding, property, sales, use, franchise or other taxes of any of the Seller, or of the Business, accrued, due and/or owing before the Closing Date; and

(iv)   any costs and expenses incurred by Seller and/or the Business incident to the negotiation and preparation of this Agreement and the consummation of the transactions contemplated hereby; and

(v)    save and except for the tax liabilities specifically attributable to Buyer as set forth in Section 10 below, any tax liability of Seller, or the Business, resulting from the transactions contemplated herein, including, without limitation, any recapture by Seller or the Business of investment tax credit or depreciation; and

(vi)   any claim, demand, or cause of action, of any kind, not assumed as part of the Post-Closing Business Obligations, relating to: (A) the ownership, control or operation of the Business at any time prior to or after the Closing Date; or (B) the ownership, control or operation of non-business operations of Seller at any time prior to or after the Closing Date; and

(vii)  any wages, salary, severance, compensation, payments, bonuses, commissions, vacation or holiday pay, medical benefits, post-retirement medical benefits, fringe benefits, long-term disability benefits, life insurance benefits, any duties, obligations or liabilities arising under any employee benefit plan, policy or practice, whether defined by Section 3(3) of the Employee Retirement Income Security Act of 1974, as amended and in effect ("**ERISA**") or otherwise, relating to the employees or independent contractors of the Business; and

(viii) any wages, salary, severance, compensation, bonuses, commissions, vacation or holiday pay, medical benefits, post-retirement medical benefits, fringe benefits, long-term disability benefits, life insurance benefits, any duties, obligations or liabilities arising under any employee benefit plan, policy or practice, whether defined by Section 3(3) of ERISA or otherwise, accruing at any time prior to or

after any date of Closing and/or relating to any employees or independent contractors of Seller's non-Business operations; and

**(ix)**    save and except for those items assumed as part of the Post-Closing Business Obligations, any other amounts due to any employees or former employees or independent contractors of Seller and/or the Business; or

**(x)**    any other liability or obligation of Seller or the Business, of any type or nature whatsoever, save and except for those items assumed as part of the Post-Closing Business Obligations, arising or accruing prior to or after the Closing Date.

**(b)**    <u>Assumed Liabilities</u>. Buyer shall only assume, as post-closing business obligations, the performance obligations of Seller and the Business to be described further at a later date, but Buyer shall NOT assume any other or further liabilities or obligations of Seller of any type or nature whatsoever (the "**Post-Closing Business Obligations**"). Except for the Post-Closing Business Obligations, any and all other liabilities or obligations of Seller and/or the Business shall at all times be and remain the sole and exclusive liabilities and obligations of Seller, and thus are hereby disclaimed in entirety and in perpetuity by the Buyer. Buyer's assumption of the Post-Closing Business Obligations shall be memorialized by an assignment and assumption agreement.

**4.**    <u>Purchase Price; Purchase Price Apportionment; Other Terms</u>. The "**Purchase Price**" for the purchase and sale of the Assets and the assignment and assumption of the Post-Closing Business Obligations shall be due, payable, allocable and creditable as follows:

**(a)**    <u>Closing Date Payment</u>. The sum of Five Hundred Twenty-Five Thousand Dollars and 00/100 US dollars ($525,000.000) shall be due and payable by the Buyer to Seller on and as of the Closing Date (the "**Purchase Price**" aka the "**Closing Date Payment**"). This Closing Date Payment is subject to increase due to the need to auction this property through the bankruptcy process. In the event there is competitive bidding, and Buyer is the winning bidder this Closing Date is subject to increase due to said bidding and will be set and established in the amount of Buyer's winning bid.

**(b)**    The Purchase Price shall be apportioned in such manner and amounts to be described further by the Buyer at a later date.

**(c)**    **The Purchase Price stated above is not refundable, save and except for the requirement that this Agreement is approved by the Court pursuant to a non-appealable final Order as the first and only agreement. However, notwithstanding anything to the contrary contained herein, if for any reason this Agreement is not approved by the Court as the first and only agreement, then in the Buyer's sole discretion the Agreement may either be withdrawn in its entirety or maintained as a back-up contract; and in either of those events, the Purchase Price becomes fully refundable unless this Agreement is ultimately consummated at Closing. Further, if the Buyer's Agreement does not close because another contract was approved by the Court and ultimately closed, then the Buyer shall be entitled to a return of the $10,000 of earnest money paid to secure Seller's patent_____plus its reasonable legal fees not to exceed an additional $10,000 (subject to Court approval) for its efforts in procuring the Agreement and participating in the Case, all to be paid at Closing by the Seller.**

**(d)**     The Closing Date Payment was escrowed with counsel for the Buyer prior to the Seller filing a petition for relief under Chapter 11 of the Bankruptcy Code. Such escrow of the Closing Date Payment is a material term of this agreement such that any upset bidder will be required to similarly escrow funds to be considered a qualified competing bidder.

**(e)**     The Buyer hereby reserves the right to modify, and thereby increase, the consideration set forth herein above by including any additional valuable consideration the Buyer may so choose to offer – including, but not limited to, the forgiveness of debt and the value of judgements.

**5.**     <u>Closing Date</u>.  The Parties acknowledge and agree that the closing of the transactions contemplated by this Agreement, including its exhibits, (the "**Closing**") will occur within 20 business days after the entry of the Order approving this Agreement and the underlying Sale (the "**Closing Date**").

**6.**     <u>Right of Exclusion</u>.  If, following the Chapter 11 filing by Watertech, the Buyer chooses to exclude one or more asset from the Assets (the "**Exclusion Right**"), then the Buyer agrees to provide Seller with express written notice of any said excluded Asset (the "**Exclusion Notice**"). However, if no such notice is provided, then all Assets as previously described herein that exist on the Closing Date will be the final list of Assets. Notwithstanding anything herein to the contrary, if any Assets become subject to the Exclusion Right, then the Buyer agrees that the Purchase Price shall remain unchanged and without set-off.

**7.**     <u>Representations and Warranties and Covenants of Seller</u>. Seller jointly and severally represent and warrant to Buyer as follows:

**(a)**     <u>Organization</u>. Watertech is a limited liability company duly organized, validly existing under the laws of the State of South Carolina.

**(b)**     <u>Authority</u>.

**(i)**     Seller has the full power and authority to enter into this Agreement, to consummate the transactions contemplated hereby and to comply with the terms, conditions and provisions hereof. The execution, delivery and performance of this Agreement by Watertech has been duly authorized and approved by all requisite corporate action, subject to the entry of the Order.

**(ii)**     The execution, delivery and performance of this Agreement and the consummation of the transactions contemplated hereby or compliance with or fulfillment of the terms and provisions hereof or of any other agreement or instrument contemplated hereby, do not and will not conflict with or result in a breach of any agreement to which any of Seller or the Business is a party.

**(iii)**     This Agreement has been duly executed and delivered by Seller and is the legal and valid obligation of Seller enforceable against Seller in accordance with its terms, subject to the jurisdiction of the Court and the entry of the Order.

<u>Litigation</u>. Watertech filed a petition for relief under chapter 11 of the United States Bankruptcy Code and is currently effectuating a sale under the oversight of the Bankruptcy Court. Watertech is also the plaintiff derivative shareholder action styled as *Watertech*

*Holdings, LLC f/k/a Watertech Equipment and Sales, LLC by and through its members David L. Stern and David V. Pobiak v. Glenn I. Barrett, Keith J. Johnson, Eric Frische, Robert Fei, Tectrucks, LLC, Rivendell, LLC, Barron Algae, LLC and Cleanstrike, LLC,* Case No.: 2018-CP-10-3412 pending before the Charleston County Court of Common Pleas (the "**Derivative Action**"). With the exception of the matters disclosed herein, there exists no litigation, action, suit, claim or proceeding pending, or to the knowledge of any of the Seller threatened, against or affecting the Business, the Assets and/or the Post-Closing Business Obligations, at law or in equity, before any mediator, arbitrator, court or governmental authority.

(c)    <u>Taxes.</u> "**Tax Returns**" means all returns, reports, statements, and forms required to be filed in respect of any tax due to a municipal authority.

    (i)    Save and except for any taxes owed by Buyers with respect to the purchase and sale transaction set forth herein, or any taxes for which the Buyer is obligated hereunder, Seller has paid, or will pay when due or finally settled (or treated through Seller's bankruptcy), all taxes relating to the Business that are or become due and payable, for all periods up to and including the Closing Date, or that may be occasioned at any time by the payment of the Purchase Price by Buyer. Seller will file all Tax Returns relating to the Business, for all periods up to and including the Closing Date.

    (ii)    There are no liens for such taxes on the Assets or the Business.

(d)    <u>Title to Properties; Encumbrances; Sufficiency of Assets.</u> Seller, as applicable, has good, valid and marketable title to its respective assets that form the Assets. None of the Assets are subject to any mortgage, pledge, lien, security interest, encumbrance or charge of any kind. Seller has the complete and unrestricted power and the unqualified right to sell, assign, transfer and deliver to Buyer subject to the jurisdiction of the Court and the entry of the Order, and Buyer is acquiring, good, valid and marketable title to, the Assets, free and clear of all mortgages, pledges, liens, security interests, conditional sales agreements, encumbrances, claims or charges of any kind pursuant to the Order. The Bill of Sale, Assignment and Assumption Agreement, and the deeds, endorsements, assignments and other instruments being executed and delivered to Buyer by Seller at the Closing are valid and binding obligations of the Seller, enforceable in accordance with their terms, and will effectively vest in Buyer good, valid and marketable title to all the Assets and assign to Buyer the Post-Closing Business Obligations. To Seller's knowledge, Seller's Assets and Business operations do not infringe upon the rights of any third-party, including without limitation upon the intellectual property rights of any third-party.

(e)    <u>Ordinary Course Operations; Financials.</u> The Seller has ceased conducting the Business in the ordinary course, and there has not occurred with respect to the business any material adverse change or event since that date. The financial data and other information provided to Buyer in the context of due diligence, as delivered to Buyer prior to the Closing of this Agreement, are true and correct in all material respects, and reflect the actual financial status, working capital, profits and losses, and the status of the Business as of the dates such documents were provided to Buyer.

(f)    <u>Consents.</u> Except the Bankruptcy Court's approval of Watertech's motion to sell assets based upon this APA, no consent(s) are required from any third-party person or entity to authorize the transactions contemplated by this Agreement, including without limitation

the purchase and sale of the Assets and the assignment and assumption of the Post-Closing Business Obligations (collectively, the "**Consents**").  Seller covenants and agrees to obtain and deliver to Buyer at Closing all Consents (if any), the delivery of which at Closing shall be a condition precedent to Buyer's performance of the terms and conditions of this Agreement and Buyer's consummation of a Closing hereunder.

**(g)**     <u>No Reliance</u>. Except for the representations and warranties contained in this Agreement, Buyer has not relied upon, and has not been induced to enter into this Agreement by, any other representations or warranties or any other information made on behalf of any of the Seller. The Parties, with their consultants and representatives, are sophisticated business persons, and have had opportunity to be represented by their own counsel.

**(h)**     <u>Post-Closing Operations</u>. Post-closing, the Seller will cease operations except for the purposes of closing the Bankruptcy case and assisting the Buyer, at the buyers expense, in any reasonable matters it may require that involve the Assets.

**8.**     <u>Representations and Warranties of Buyer</u>. Buyer represents and warrants to Seller as follows:

**(a)**     <u>Organization</u>.  Buyer is a limited liability company duly organized and validly existing and in good standing under the laws of the State of South Carolina. Buyer has the power and authority to own its own properties and assets and to carry out its businesses and operations.

**(b)**     <u>Authority</u>.

**(i)**     Buyer has the full power and authority to enter into this Agreement, to consummate the transactions contemplated hereby and to comply with the terms, conditions and provisions hereof. The execution, delivery and performance of this Agreement by Buyer has been duly authorized and approved by all requisite action.

**(ii)**     The execution, delivery and performance of this Agreement and the consummation of the transactions contemplated hereby or compliance with or fulfillment of the terms and provisions hereof or of any other agreement or instrument contemplated hereby, do not and will not conflict with or result in a breach of any agreement to which Buyer is a party.

**(iii)**     This Agreement has been duly executed and delivered by Buyer and is the legal, valid and binding obligation of Buyer enforceable against Buyer in accordance with its terms, subject to the jurisdiction of the Court and the entry of the Order.

**(c)**     <u>Litigation</u>. There exists no known litigation, action, suit, claim or proceeding pending against or affecting Buyer, at law or in equity, before any court or governmental authority other than as disclosed herein.

**(d)**     <u>No Reliance</u>. Except for the representations and warranties contained in this Agreement, Buyer has not relied upon, and has not been induced to enter into this Agreement by, any other representations or warranties or any other information made on behalf of Seller. The Parties with their consultants and representatives are sophisticated business persons, and have had opportunity to be represented by their own counsel.

**9.**  <u>Conditions to Closing.</u>

   **(a)**    The obligations of Buyer to be performed under this Agreement and its exhibits are subject to the fulfillment, on or before the Closing Date, of the following conditions precedent:

   **(i)**    <u>Representations and Warranties Correct.</u> All representations and warranties of Seller made in this Agreement or in any certificate, schedule, instrument or other document delivered pursuant to this Agreement or in due diligence in advance of the execution of this Agreement shall be true and correct in all material respects, including without limitation relating to financial performance and status of the Business and as if made and/or updated on and as of the Closing Date.

   **(ii)**    <u>Performance.</u> Seller shall have performed and complied with all covenants, terms and conditions required by this Agreement to be performed or complied with by Seller prior to or on the Closing Date, in all material respects, including obtaining the Order.

   **(iii)**    [INTENTIONALLY OMITTED]

   **(iv)**    <u>Company Proceedings</u>. Watertech shall have delivered to Buyer copies of resolutions of such Seller, sufficient in the judgment of Buyer's counsel to authorize the performance of the transactions hereunder by Watertech.

   **(v)**    <u>Other Consents.</u> All Consents and approvals necessary for the valid consummation of the transactions contemplated by this Agreement and its exhibits, if any, shall have been obtained by Seller and delivered to Buyer, and all certifications and assurances reasonably required by Buyer with respect thereto shall have been obtained and delivered.

   **(vi)**    <u>Adverse Proceedings</u>.  No action, suit, or proceeding shall be pending or threatened before any court or quasi-judicial or administrative agency of any federal, state, local, or foreign jurisdiction or before any arbitrator relating to the Assets and/or the Business and/or any Post-Closing Business Obligations other than those disclosed in this Agreement.

   **(vii)**    <u>Searches</u>. Buyer shall procure, at Buyer's sole expense, the following: UCC, lien, judgment, tax and bankruptcy searches as against each of the Seller and the Business, prior to the Closing; and the Seller represents that such searches shall show no liens, judgments, taxes due or bankruptcies except the Case within five (5) business days of the Closing Date, and showing that there are no liens against the Assets that are not being released as part of the Court order approving this sale.

   **(viii)**    <u>Sales Taxes</u>. Any sales tax delinquency of Seller, relating to the Business, from any time or period, shall be paid in full by Seller in advance of Closing.

   **(b)**    The obligations of Seller to be performed under this Agreement are subject to the fulfillment, on or before the Closing Date, of the following conditions precedent:

   **(i)**    <u>Representations and Warranties Correct</u>. All representations and warranties of Buyer in any certificate, exhibit, schedule, instrument or other document delivered pursuant to this Agreement, shall be true and correct in all material respects as if

made on the applicable date of Closing.

**(ii)** <u>Performance</u>. Buyer shall have performed and complied with all covenants, terms and conditions required by this Agreement to be performed or complied with by it prior to or on the applicable date of Closing.

**(iii)** <u>Company Proceedings</u>. If reasonably requested by Seller in writing prior to the Closing Date, Buyer shall have delivered to Seller copies of resolutions and other company proceedings of Buyer sufficient to authorize the transactions by Buyer hereunder.

**10.** <u>Sales Tax Compliance</u>. Buyer and Seller shall cooperate to comply with all applicable state sales tax/bulk sales laws, including, without limitation, Section 1141(c) of the South Carolina State Tax Law and any commensurate laws of the State of South Carolina. Buyer shall file any notices required to be provided to the South Carolina State Department of Taxation Bulk Sales Unit or any commensurate Agency in the State of South Carolina (each, a "**Bulk Sales Unit**") at least ten (10) business days prior to the Closing Date (each, a "**Bulk Sales Filing**"). In the event a Bulk Sales Filing identifies sales tax remittance delinquencies by any Seller and/or the Business (any, a "**Sales Tax Delinquency**"), Seller shall jointly and severally be liable for and immediately pay and resolve the Sales Tax Delinquency directly with the applicable state agency, such that all Sales Tax Delinquency is paid in full and a release thereon received from the applicable state tax department, on or prior to the Closing Date. Seller shall, jointly and severally, defend, indemnify and hold harmless Buyer from and against any and all Sales Tax Delinquency, in perpetuity and in entirety and whether arising prior to or after any Closing, and Buyer may set-off against the Watertech Payments for any such liabilities incurred. In the event a Bulk Sales Filing generates sales taxes due as a result of the purchase and sale of tangible non-exempt Assets, such sales tax payment obligation shall be the responsibility of Seller, which shall tender payment of same contemporaneously with the Closing.

**11.** <u>Other Agreements</u>.

**(a)** <u>Further Assurances</u>. From time-to-time after the execution of this Agreement, Seller and Buyer shall execute and deliver to other Party such other instruments of conveyance and transfer and such other documents as Buyer or Seller may reasonably request or as may be otherwise necessary to more effectively consummate the transactions contemplated by this Agreement, including without limitation the conveyance and transfer of the Assets to, and vesting of the Assets in, Buyer, and to put Buyer in possession of the Assets and each part thereof.

**(b)** <u>Negotiated Agreement</u>. This Agreement and the instruments to be executed pursuant to this Agreement are the result of negotiations between Seller and Buyer. Accordingly, none of the foregoing Parties shall be deemed to be the author of this Agreement or the resulting documents, and there shall be no presumption that this Agreement or any of such documents are to be construed for or against any such Party on the basis of the authorship of the documents.

**12.** <u>Intentionally Omitted</u>.

**13.** <u>Closing Documents</u>

**(a)** <u>Seller's Obligations</u>. On the Closing Date, Seller shall deliver to Buyer physical possession of all Assets, and shall execute and/or deliver to Buyer all of the following:

   **(i)**     <u>Resolutions</u>. Copies of resolutions of Watertech certified by the president/manager of same, authorizing the execution, delivery and performance of this Agreement and the transactions contemplated hereby.

   **(ii)**    <u>Bill of Sale; Assignment and Assumption Agreement</u>. The Bill of Sale and the Assignment and Assumption Agreement, with each properly executed.

   **(iii)**   <u>Consents</u>. Any and all Consents.

**(b)**    <u>Buyer's Obligations</u>. On the Closing Date, Buyer shall deliver to Seller the following:

   **(i)**     <u>Resolutions</u>. If requested by Seller in writing, Buyer shall deliver copies of resolutions of Buyer authorizing the execution, delivery and performance of this Agreement and the transactions contemplated hereby; and

   **(ii)**    <u>Payment</u>. The Closing Date Payment.


**(c)**    <u>Joint Obligations</u>. On the Closing Date, the Parties will deliver each to the other the certificates, records, schedules, exhibits, and the other documents required by the terms of this Agreement.

**14.**  <u>Seller's Restrictive Covenants</u>.

**(a)**    <u>Acknowledgments of the Parties</u>. The Seller acknowledges, agrees and expects that the Buyer will continue to invest significant time, money and resources to develop and maintain the Assets and the Business, including without limitation the Goodwill associated with the Business and its Customers/Suppliers (each as defined below).

**(b)**    <u>Restrictive Covenants</u>. The Seller hereby agrees that as soon as possible, the Seller shall wind-up its final outstanding business and file articles of dissolution with respect to the Seller, its subsidiaries and its directly affiliated entities.

**15.**  <u>Additional Provisions</u>.

**(a)**    [INTENTIONALLY OMITTED]

**(b)**    <u>Notices</u>. All notices given in connection with or pursuant to this Agreement shall be in writing and shall be effective only if delivered personally to, or sent by registered or certified mail, postage prepaid, return receipt requested, to the Parties as follows:

To Buyer:

Purecycle LLC
In care of:
12000 North Bayshore Drive
Suite 202
North Miami, FL 33181
Attention: David Pobiak

To Watertech:

> Watertech Holdings, LLC (f/k/a Watertech Equipment and Sales, LLC)
> In care of:
> 4360 Corporate Rd.
> Suite 100
> North Charleston, SC 29405
> Attention: Bob Fei

**(c)**   Assignment; Successors and Assigns. This Agreement or any right hereunder shall not be assigned by any Party without the written consent of the other Party(ies). Subject to the previous sentence, this Agreement shall inure to the benefit of and be binding upon the successors, heirs, distributees, legal representatives and assigns of the respective Parties hereto.

**(d)**   Entire Agreement. This Agreement constitutes the entire agreement between the Parties hereto relating to the transactions contemplated hereunder, and may not be changed except by an instrument in writing signed by all Parties and approved by the Court. This Agreement may be executed in any number of counterparts and each counterpart shall constitute an original instrument, but all such separate counterparts shall constitute only one and the same instrument.

**(e)**   Partial Invalidity.  In case any one or more of the provisions contained herein shall, for any reason, be held to be invalid, illegal or unenforceable in any respect, such invalidity, illegality or unenforceability shall not affect any other provisions of this Agreement, but this Agreement shall be construed as if such invalid, illegal or unenforceable provision or provisions had never been contained herein.

**(f)**   Titles and Headings. Titles and headings to sections herein are inserted for convenience of reference only and are not intended to be a part of or to affect the meaning or interpretation of this Agreement.

**(g)**   Third Party Beneficiaries. Each Party hereto intends that this Agreement shall not benefit or create any right or cause of action in or on behalf of any person or entity other than the Parties hereto, including their proper successors and assigns.

**(h)**   Waiver of Jury Trial. EACH OF THE PARTIES HEREBY IRREVOCABLY WAIVES, TO THE FULLEST EXTENT PERMITTED BY LAW, ALL RIGHTS TO TRIAL BY JURY IN ANY ACTION, PROCEEDING, OR COUNTERCLAIM (WHETHER BASED UPON CONTRACT, TORT OR OTHERWISE) ARISING OUT OF OR RELATING TO THIS AGREEMENT OR ANY OF THE TRANSACTIONS CONTEMPLATED HEREBY.

**(i)**   Commissions, Brokers and Finders' Fees. Each of the Parties represents that the negotiations relative to this Agreement and the transactions contemplated hereby have been carried on by Seller directly with Buyer and in such manner as not to give rise to any claims against any of the Parties hereto for a brokerage commission, finders' fee or other like payment. Insofar as any such claims are made which are alleged to be based on an agreement or arrangements made by, or on behalf of, a Party, such Party agrees to defend, indemnify and hold the other party harmless from and against all such liability, loss, cost, charge or expense, including reasonable counsel fees, as may arise therefrom.

**(j)**      Expenses. Each Party hereto will bear the legal, accounting and other expenses incurred by such Party in connection with the negotiation, preparation and execution of this Agreement and the transactions contemplated hereby.

Waiver of Compliance. Any failure of Seller, on the one hand, or Buyer, on the other, to comply with any obligations, covenants, agreements or conditions herein may be expressly waived in writing by Buyer or Seller(s), respectively, but such waiver or failure to insist upon strict compliance with such obligation, covenant, agreement or condition shall not operate as a waiver of, or estoppel with respect to, any subsequent or other failure.

**(k)**      Confidentiality; Public Announcement. With respect to all information disclosed by either Party to the other in connection with this Agreement, and its exhibits, and not contained herein, are confidential and may only be disclosed by the parties to their respective directors, advisers and employees on a need to know basis. Notwithstanding the foregoing, any disclosure of information required by the Bankruptcy Court with respect to the transactions contemplated herein shall not be a breach of this confidentiality obligation; and, further, upon the Closing, Buyer shall have the right and discretion to draft and disseminate a public announcement and/or press release describing the purchase of the Business by Buyer and the industry-related consequences thereof.

**(l)**      Non-Disparagement. No Party will disparage or otherwise publish or communicate "derogatory" statements or opinions about the other Party or such Party's businesses or personnel, be it verbally or in writing. For purposes of this Agreement, "derogatory" means a statement that detracts from a Party's character, standing, or reputation.

**(m)**      Governing Law; Etc.

**(i)**      This Agreement and the legal relations among the Parties hereto shall be governed by and construed by the Court in accordance with the laws of the State of South Carolina, without regard to any conflicts of law doctrine.

**(ii)**      Any action or proceeding based on this Agreement shall be brought only in the Court which shall maintain jurisdiction over the Case and this Agreement to the fullest extent allowable. Buyer and Seller hereby submit to the exclusive personal jurisdiction of the Court, and waive any rights to contest same including without limitation based upon allegations of inconvenient forum. In the event of litigation or other formal proceedings involving this Agreement, the non-prevailing party shall reimburse the prevailing or substantially prevailing party for all costs and expenses, including reasonable attorneys' fees and expenses, incurred in connection with any such litigation, including any appeal. In the event any party requires equitable relief, including without limitation due to any breach by any of Seller of the restrictive covenants set forth in Section 14 hereinabove, said party may seek preliminary or permanent injunctive relief including without limitation by seeking a temporary restraining order, on an ex-parte basis, and without any requirement to post a bond, which requirement (if any) is hereby deemed waived.

**IN WITNESS WHEREOF**, the Parties hereto have executed this First Amended and Restated Asset Purchase Agreement, as of the Modification Date first set forth herein above.

**BUYER**:

PURECYCLE LLC

_____

By: David Pobiak
Its: Manager

**SELLER**:

WATERTECH HOLDINGS, LLC (F/K/A WATERTECH EQUIPMENT AND SALES, LLC)

_____

By: _____
Its: Managing Member

**EXHIBIT 1**
**TO THE FIRST AMENDED AND RESTATED**
**ASSET PURCHASE AGREEMENT**

**THE ASSETS**

Intellectual Property

Registered Trademark MAG 50 with SN 86814584 and Register # 5034964

Any and all "know how" related to intellectual properties

Patent Filing

| | |
|---|---|
| EFS ID: | 28998854 |
| Reference Number: | 44873-0002WO1 |
| Confirmation Number: | 1153 |
| Int'l Application Number: | PCT/US17/28991 |

Patent # 10588992

Telephone and Internet Assets

Customers and Consumer Lists/Accounts

- Any and all prospect and potential customer lists and accounts (including without limitation email address lists), aggregated, collected, maintained or procured by Seller during or for the operation of the Business, through and including the Closing Date, including without limitation customer and consumer names, addresses, telephone numbers, fax numbers, emails and account histories, etc.

Goodwill

- Any and all goodwill associated with the Business on and as of the Closing Date

Environmental and Hazard Remediation Technology

**Additional Items**:

- The Watertech derivative lawsuit

- NABAS Group Inc. stock and Note Receivable (See Schedule A/B 71 Docket 60)

- Breach of Contract claims against Nano/GFS Mold (See Schedule A/B 75 Docket 60)

- Claims against Barron Algae / Glenn Barret (See Schedule A/B 75 Docket 60)

- Algae Next Note receivable

- That certain Exclusive Patent Sublicense Agreement dated October 31,2017, as amended from time-to-time

- That certain settlement agreement between Watertech, its subsidiaries, successors and/or assigns, and NABAS Group, Inc., a Maryland corporation ("**NGI**").

- The NGI Promissory Note.

- The NGI Stock Certificates representing Watertech's ownership of NGI equity.

- All rights related to non-disclosure agreements, non-competition agreements, ownership of inventions, etc., from employment, consulting or subscription agreements between Watertech, its subsidiaries, successors and/or assigns, and any employee, consultant, contractor, unitholder or creditor of Watertech, its subsidiaries, successors and/or assigns.

- Any and all restrictive covenant agreements (NDAs, non-competition agreements, etc.) of Watertech, its subsidiaries, successors and/or assigns.

- All consulting agreements between Watertech, or any of its subsidiaries, successors and/or assigns, and any consultant

- All employment agreements between Clean Earth Enterprises, or any of its subsidiaries, successors and/or assigns, and any employee.

- All consulting agreements between Clean Earth Enterprises, or any of its subsidiaries, successors and/or assigns, and/or any consultant.

- All organizational documents, including but not limited to: operating agreements, articles of organization, by-laws and articles of incorporation for Watertech and its subsidiaries, Clean Earth Enterprises and its subsidiaries or any other company in which Watertech holds any ownership interest.

- All organizational documents and agreements involving Algae to Omega LLC, Algae to Omega Holdings, Algae Matrix Technologies, Clean Earth Algae USA, etc.

- All non-disclosure and/or non-compete agreements between Watertech or its subsidiaries, Clean Earth Enterprises or its subsidiaries or any other company in which Watertech holds any ownership interest and its employee, consultant or any other individual doing work on behalf of such entity.