**IN THE UNITED STATES BANKRUPTCY COURT
DISTRICT OF SOUTH CAROLINA**

| | |
|---|---|
| In re:<br><br>Watertech Holdings, LLC<br><br>Debtor. | Case No.: 20-00662-jw<br>Chapter 11 |

**EXPEDITED MOTION OF WATERTECH ASSET ACQUISITION GROUP, LLC
TO RECONSIDER ORDER APPROVING DEBTOR'S MOTION FOR ORDER
AUTHORIZING THE SALE OF ASSETS OF THE DEBTOR FREE AND CLEAR OF
LIENS, CLAIMS, ENCUMBRANCES, AND OTHER INTERESTS**

Watertech Asset Acquisition Group, LLC ("WAAG") submits this Motion to Reconsider the Order Approving the Sale of Assets of the Debtor Free and Clear of Liens, Claims, Encumbrances and Other Interest Pursuant to 11 U.S.C. § 363(m) (the "Sale Order") (Doc. 97), pursuant to Rules 52 and 59(e), Fed. R. Civ. P., made applicable to this proceeding by Rules 7052 and 9023 of the Federal Rules of Bankruptcy Procedure. The crux of this Motion is a request that the Court reconsider its ruling at the sale hearing that the late bid of PureCycle, LLC was in good faith and that the sale of the Debtor's assets to PureCycle was approved.

WAAG recognizes that as a result of the upset bid submitted by PureCycle and the competitive bidding that occurred on August 5, the Debtor's estate and creditors of the estate have realized a unexpected windfall. Unfortunately, it has come at the expense of WAAG and as a result of unlawful conduct of a business associate and an insider affiliated with WAAG. Despite the circumstances that led to the events at the Sale Hearing, WAAG tendered in good faith a $500,000 bid for the assets. Following WAAG's Motion to Stay the sale of the assets to PureCycle (Doc. No. 86), WAAG is in the process of depositing $375,000 with the Debtor, which combined with the $125,000 Stalking Horse Deposit already held by the Debtor, constitutes the deposit of

1

WAAG's bid at the Sale Hearing. Should the Court ultimately determine that the PureCycle bid is disallowed, WAAG is prepared to comply with its $500,000 bid. Under these unusual circumstances, WAAG recognizes that although it is a bitter $250,000 pill, it is a pill WAAG is prepared to swallow.

That being said, requiring WAAG to abide by the $500,000 bid it was forced to make only feeds into the scheme devised by PureCycle to breach the agreements between it and NanoPure (an affiliate of WAAG), compete with against it, and damages the business standing of these small, start-up companies. PureCycle should not be rewarded for coming into court with unclean hands, and instead, should be disqualified as a bidder for its bad faith and WAAG allowed to proceed with its original bid that was made in good faith.

The Sale Order contains a finding that PureCycle is a "good faith purchaser" and is therefore entitled to the protections of 11 U.S.C. § 363(m) if the Sale Order is reversed or modified on appeal. The Fourth Circuit Court of Appeals has affirmed in an unpublished opinion that section 363(m) is inapplicable when a sale order is attacked collaterally rather than on appeal. *In re Gunboat International, Ltd.*, 557 B.R. 410 (Bankr. E.D.N.C 2016) (citing *In re Alan Gable Oil Dev. Co.* 1992 WL 329419 at *4 (4th Cir. Nov. 12, 1992) ("(W)here an order authorizing a sale is challenged collaterally by a motion under Fed. R. Civ. P. 60(b), section 363(m) on its face does not divests the bankruptcy court of the power to upset the sale under proper circumstances."); *see also In re Ducane Gas Grills, Inc.,* 320 B.R. 324, 333 (Bankr. D.S.C. 2004) (noting that a party may challenge an order authorizing a sale of assets "by either (1) objecting to the proposed sale and then appealing the sale order to the district court or (2) attacking the order collaterally pursuant to Fed. R. Civ. P. 60(b)"); *In re Edwards*, 962 F.2d 641, 645 (7th Cir. 1992) (stating that § 363(m) "does not of its own force preclude collateral attack on such sales").

WAAG recognizes that the Court has broad discretion to allow a late bid and approve the sale of the assets of the Debtor. In this Motion, WAAG requests only that the Court allow an evidentiary hearing and reconsider its holding that PureCycle was acting in good faith as set forth on pages 18-20 of the Sale Order. As explained further below, WAAG is informed and believes that if the Court hears the evidence on PureCycle's bad faith, the Court will be able to easily conclude that the sale of the assets to PureCucle should be set aside.

## FACTS AND PROCEDURAL HISTORY

1. The Debtor filed its Chapter 11 petition on February 6, 2020.

2. Venue is proper in this Court pursuant to 28 U.S.C. § 1408-1409.

3. The consideration of a sale of property of the estate is a core proceeding pursuant to 28 U.S.C. § 157(b)(2)(N), and the court has jurisdiction pursuant to 28 U.S.C. §§ 151, 157, and 363.

4. On March 2, 2020, the Debtor filed its Motion for Order Authorizing the Sale of Assets of the Debtor free and Clear of Liens, Claims, Encumbrances, and Other Interests Pursuant to 11 U.S.C. § 363 (the "Sale Motion") seeking to sell all of its assets to the "Stalking Horse," WAAG.

5. The Debtor is the prior owner of an Exclusive Patent License Agreement dated February 16, 2015 between the Debtor and Battelle Memorial Institute (the "Battelle License"). As more fully explained in the Affidavit of Bob Fei, (Doc. No. 67-10), which is incorporated herein by reference, in November 2017, the Debtor entered into a Sublicense Agreement for all of its intellectual property, including the Battelle License, with NanoPure. (*Id*. ¶ 7.) NanoPure paid $1,100,000 to the Debtor for the Sub-License. (Proffer.) Unbeknownst to NanoPure, the Debtor was in default of the Batelle License. (*Id*.) Because the Debtor lacked funds, and because

3

NanoPure had already invested millions into the Debtor, NanoPure agreed to cure the default of the Batelle License and in exchange and because NanoPure had already paid for the Sublicense, the Debtor agreed and consented to the assignment of the Batelle License to NanoPure. (*Id.*) As a result, after the assignment, the Batelle License was no longer an asset of the Debtor and therefore not part of the assets being sold. (*Id.*)

6. One of the terms of the agreement between the Debtor and NanoPure was that the Debtor would receive a profit-share in NanoPure. (Proffer). In exchange, the Debtor's founders agreed to execute and deliver certain non-competition agreements to NanoPure. (*Id.*) Ultimately, the Debtor's founders refused to deliver the agreements, and NanoPure declared its agreement with the Debtor in default. (*Id.*) Conversely, the Debtor alleges it has a claim for breach of contract against NanoPure, which it values at $0.00. There are no other significant assets of the Debtor. (Doc. No. 79, Proffer, Fei Aff.)

7. It is NanoPure's position that it has exclusive control and ownership of the Batelle License and that it owes the Debtor nothing because the Debtor's founders refused to deliver the required agreements. However, the principals of NanoPure, which include Steve Gareleck and David Pobiak, were interested in resolving any potential disputes over the ownership of the Batelle License so that NanoPure could move forward, through its subsidiary, in certain agreements to develop and distribute products developed by NanoPure using the Batelle license.

8. As the Court is aware, David Pobiak is a shareholder and creditor of the Debtor, holding at least a 1.75% interest in the Debtor. He is also an owner of NanoPure, LLC, which is an entity affiliated with WAAG, and a 5% owner of NanoTech Brazil, a subsidiary of NanoPure, LLC.

HSB 6364325 v.1

9. Pobiak, through his capacity as a member, employee, and officer of NanoPure and its related entities, had free and open access to closely held proprietary information of NanoPure, including NanoPure's intellectual property and designs. To protect and safeguard such information, Pobiak is subject to a confidentiality and non-disclosure agreement.

10. Pobiak was also involved in developing and implementing NanoPure's strategy concerning the Batelle License, including but not limited to the formation of WAAG. At the time he participated in the development of NanoPure's strategy to clear the path for the use of the Batelle License, he had fiduciary responsibilities to NanoPure and its affiliates, and he was restricted from disclosure by the confidentiality and non-disclosure agreement he had signed.

11. Ultimately, WAAG was formed for the purpose of acquiring the subject assets of the Debtor for NanoPure's benefit to eliminate the risk of litigation. Through his status, Pobiak had confidential and proprietary information about WAAG's available funding and strategy related to its bid, information that was not voluntarily disclosed by WAAG or otherwise made available to other potential bidders, including information disclosed only in confidential meetings with WAAG's counsel. Further, through the course of the case and as consideration for WAAG's bid, Pobiak had agreed to waive any claims against the bankruptcy estate in order to make WAAG's offer more attractive. Pobiak was also given regular updates on the sales process from WAAG and was privy to inside information related to WAAG's activities and financial information, including but not limited to, WAAG's cash position and the ability to fund the purchase price of the Debtor's assets.

12. WAAG and the Debtor entered into the Asset Purchase Agreement on January 24, 2020, and the Sale Motion followed.

13. Even though WAAG believes that there is no real technology or intellectual property of the Debtor included in the Assets to be sold, WAAG submitted its Stalking Horse bid of $250,000 for the purpose of acquiring any rights the Debtor may have to dispute the validity of the Batelle License so that any subsequent litigation related to the Batelle License would become moot. Thus, WAAG based its bid solely on the potential cost of lengthy and protracted litigation related to the Batelle License, an asset that the Debtor transferred to NanoPure before filing bankruptcy.

14. The United States Trustee ("UST") objected to the Bidding Procedures and Sale Motion, (Doc. No. 34), but ultimately agreed that the issues raised in his objection would be continued to the Sale Hearing. Specifically, the UST questioned whether the sale was in the Debtor's best business judgment, and requesting that the Debtor submit evidence in the record concerning (1) the connection of WAAG to the Debtor and to NanoPure, and (2) the value and identity of the Assets being sold.

15. In conjunction with the Sale Motion, a Consent Bid Procedures Order was entered on April 15, 2020 that required, among other things, for upset bids to be made by June 26, 2020. No upset bids were received by the deadline. The Court later entered an order on July 9, 2020, that required any bids or objections to the Sale Motion must be filed by 10:30 a.m. on July 8, 2020.

16. The hearing on the Sale Motion was originally set for July 9, 2020, but was continued to August 5, 2020 due to concerns related to COVID-19.

17. On July 31, 2020, PureCycle submitted a bid to the Debtor in the amount of $275,000 (the "Late Bid").

18. At the time of the Late Bid, WAAG learned for the first time that Pobiak had indirectly entered into agreements to compete with NanoPure and its affiliations in violation of

various agreements. It became clear through the Late Bid that PureCycle was formed in an attempt to circumvent Pobiak's fiduciary responsibilities and obligations under the confidentiality and non-disclosure agreement. It further became clear that PureCycle based its bid and strategy on the confidential information Pobiak had learned about WAAG and NanoPure.

19. On August 3, 2020, the Debtor, UST, WAAG, and PureCycle submitted a Joint Statement of Dispute outlining the issues of the Sale Hearing. *(See* Doc. No. 79.) In the Joint Statement, the Debtor attempted to address issues raised by the UST as to whether the sale to WAAG was within the sound business judgment of the Debtor, and stated the Debtor and WAAG intended to present evidence on WAAG as a good faith, arms-length purchaser at the Sale Hearing. The Joint Statement of Dispute also noted WAAG's concerns about the timing of PureCycle's bid and whether the bid was in good faith.

20. The Joint Statement of Dispute filed on August 3, 2020 (Doc. No. 79), included, among other exhibits, copies of the confidentiality and non-disclosure agreement violated by Pobiak and information concerning the formation of PureCycle.

21. On August 5, 2020, WAAG filed an Objection to Late Bid of PureCycle, LLC (Doc. No. 81). In the Objection, WAAG argued that the Late Bid was untimely and did not substantially benefit creditors, but most importantly, that the Late Bidder was not a good faith purchaser. Specifically, WAAG submitted documentation and argument that PureCycle was managed by David Pobiak and formed on July 14, 2020, immediately before the Late Bid was submitted.

22. At the Sale Hearing on August 5, 2020, the Debtor and WAAG proferred testimony to support the Debtor's sale of its Assets to WAAG, and to address the concerns raised by the UST. Among other things, the proffer included testimony concerning (1) the ownership of WAAG, NanoPure, and of the Debtor; (2) the interests that Gareleck and Pobiak had in the Debtor and

7

NanoPure; (3) what the assets would be used for if sold by the Debtor to WAAG; and (4) the determination of the purchase price offered by WAAG and reasons why the assets were actually valued lower than WAAG's bid of $250,000.

23. Specifically, the Debtor and WAAG proffered testimony that if the sale was consummated to WAAG, then then the Debtor's Assets will remain in WAAG, and will not be merged in or sold to Nanopure. It was WAAG's intention to fully and finally extinguish the alleged liabilities of the Debtor created by the purported bad-faith actions of the founding managers of the Debtor or others, such as Pobiak.

24. Although PureCycle represented through counsel that it intended to buy the Assets because they contained technology it hoped to develop, WAAG contends that there is no technology to be transferred. Instead, WAAG argued that PureCycle intended to acquire the Debtor's Assets to acquire litigation opportunities, despite Pobiak's agreement preventing him from being involved in the purchase of the Assets. WAAG knew that if the Court approved the sale of the Assets to PureCycle, then WAAG, NanoPure, and other interested parties would have no choice but to sue PureCycle for violation of the confidentiality and nondisclosure agreement.[1] Based on these facts, WAAG requested that the Court refuse to allow PureCycle's bid, or at a minimum, consider evidence as to whether PureCycle's bid was in good faith.

25. The Court allowed the Proffer, but declined to hear any testimony or consider any evidence about the identity of PureCycle, the possibility of its insider status and the use of confidential information obtained by PureCycle in connection with its bid, what PureCycle intended to do with the assets of the Debtor and why PureCycle would be unable to use the assets, and other facts demonstrating that PureCycle was not bidding in good faith.

---

[1] This is in fact what WAAG and the other plaintiffs in the State Court Action were forced to do. *See* infra paragraph 28.

26. After ruling that no evidence other than the proffer about WAAG's bid and WAAG's status as a good faith purchaser would be considered, the Court ruled that the Late Bid would be allowed. Because there were multiple bidders, bidding was reopened. WAAG ultimately was forced to increase its high bid to $500,000, and PureCycle ultimately made the highest bid of $525,000 (the "High Bid").

27. The end result was the High Bid was substantially more than the value of the Debtors' assets, as demonstrated by comprehensive evidence concerning the value of the assets presented by the Debtor and WAAG. (*See* Doc. 79 and proffer.) But for the bad faith actions of PureCycle, the Debtor's Assets would have sold to WAAG for $250,000.

28. After the Sale Hearing, on August 10, 2020, NanoPure, WAAG, and several other interested parties, filed a suit for an injunction against Pobiak, PureCycle, and others in the Charleston Court of Common Pleas, Case No. 2020-CP-10-03485 (the "State Court Action"). The plaintiffs in the State Court action sought relief in the Charleston County Court of Common Pleas in accordance with venue and jurisdiction provisions of the Confidentiality and Non-Disclosure Agreements that gave that court exclusive jurisdiction. In their complaint, the plaintiffs seek to enjoin PureCycle from complying with the High Bid because it violates certain Confidentiality and Non-Disclosure Agreements with the plaintiffs. A Temporary Restraining Order was entered on August 13, 2020, enjoining PureCycle from completing its bid. A copy of the complaint filed in the State Court Action is attached as **Exhibit 1** and a copy of the Temporary Restraining Order is attached as **Exhibit 2.** A hearing to make the Temporary Restraining Order permanent is set for August 24, 2020.

## STANDARD OF REVIEW

There are three grounds on which a court may grant a motion to alter or amend a judgment pursuant to Rule 59(e), Fed. R. Civ. P.: "(1) to accommodate an intervening change in controlling

law; (2) to account for new evidence not available at trial; or (3) to correct a clear error of law or prevent manifest injustice." *In re Earth Structures,* 490 B.R. 199, 215-216 (Bankr. D.S.C. 2013). Further, Rule 52(b), Fed. R. Civ. P., provides that "the court may amend its findings—or make additional findings—and may amend the judgment accordingly." Rule 52(a), Fed. R. Civ. P. allows a party to question the sufficiency of evidence supporting findings. Here, WAAG requests that the Court reconsider the Sale Order to allow and consider evidence as to whether PureCycle was a good faith purchaser. Once the Court hears the ample evidence from WAAG concerning PureCycle, the Court will have sufficient evidence to support setting aside the Sale Order.

## ARGUMENT

WAAG requests that the Court reconsider the Sale Order to allow sufficient time to hear newly presented evidence and testimony as to whether the Late Bid was made in good faith. Such relief is warranted given that the Late Bid was made only days before the Sale Hearing, providing, an insufficient opportunity for the Court to hear relevant and necessary evidence concerning the Late Bid and resulting in an inequitable determination as to the sale of the Debtor's assets.

1. **The Court should consider evidence and testimony concerning the good faith status of any bidder whose bid is considered for approval by the Court.**

In determining both whether to allow a late bid and in determining whether the Debtor's sale of assets complied with 11 U.S.C. § 363, the Court should consider whether the bidder in question acted in good faith. 11 U.S.C. § 363(m); *see also In re Weatherly Frozen Food Group, Inc.,* 149 B.R. 480, 483 (Bankr. N.D. Ohio 1992); *In re Del. & Hudson Ry. Co.,* 124 B.R. 169, 176 (D. Del. 1991); *In re Abbotts Dairies*, 788 F.2d 143, 149 (3d Cir. 1986).

Here, after the Debtor filed its Sale Motion, the UST objected to WAAG as the Stalking Horse Bidder, raising questions to be answered at the Sale Hearing as to whether or not WAAG was an insider and whether WAAG's offer to buy the assets of the Debtor was in good faith. (Doc.

10

Nos. 34, 79.) The Debtor and WAAG worked diligently to demonstrate that WAAG was a good faith purchaser pursuant to 11 U.S.C. § 363, setting forth answers to respond to each of the UST's concerns in the Joint Statement of Dispute filed on August 3, 2020 (Doc. No. 79) and offering a detailed proffer at the Sale Hearing on August 5, 2020. The proffer included information on specifically what the Debtor was selling to WAAG and why WAAG wanted to purchase the assets of the Debtor when the assets had little value. The information provided by WAAG and the Debtor ultimately resolved any concerns raised by the UST.

The Late Bid was received on July 31, 2020, only days before the Sale Hearing, and there was insufficient time to fully assess whether or not PureCycle, a newly formed entity, was a good faith purchaser and whether or not the Late Bid was made in good faith. Nevertheless, on August 5, 2020, WAAG filed a detailed objection to the Late Bid, setting forth all of the information known to WAAG about PureCycle, and more particularly, about David Pobiak, someone who had an interest in the Debtor, NanoPure, and managed and possibly had an ownership interest in PureCycle. (Doc. No. 81.) WAAG's objections are also detailed in the Joint Statement of Dispute (Doc. No. 79), which included the relevant agreement that Pobiak had breached in forming PureCycle and taking advantage of confidential and proprietary information learned from WAAG and its affiliates.

Despite the fact that the meticulous scrutiny had been exercised over WAAG in connection with its bid for the assets of the Debtor since January, PureCycle was allowed to bid without any examination or inquiry into PureCycle's status, the interest of its owners or managers in the Debtor, the planned use of the Debtor's assets, the inside information used by PureCycle to make the Late Bid, or PureCycle's motivation in making the Late Bid. Instead, the Court summarily concluded

11

that the Late Bid would be allowed and upon making the High Bid, allowed PureCycle to be the successful purchaser of the Debtor's assets without further inquiry.

Based on the foregoing, the Court should reconsider the Sale Order. In determining the overall value to the estate of a purchase price for a sale, the Court must have testimony concerning the good faith status of <u>all</u> bidders and the only way to make such a determination is for the Court to hear evidence concerning each bidder. *See In re Gunboat International, Ltd.,* 557 B.R. 410 (E.D. Bank. 2016) (holding that the court's inability to ascertain the overall value to the estate of purchase price was sufficient reason to set aside the court's prior finding in sale order that purchaser was a good faith purchaser, and bankruptcy court would set aside order approving sale of debtor's assets free and clear of all liens).

In *Gunboat International,* the Bankruptcy Court approved the sale of a debtor's assets under section 363. However, a manufacturer with whom the debtor had entered into a settlement agreement concerning certain assets filed a motion to reconsider the Court's approval of the sale based on the fact that the Court had not received sufficient evidence concerning certain contracts to which the debtor was a party, and importantly, sufficient evidence as to whether the successful purchaser was a good faith purchaser. 557 B.R. at 417-418. After hearing testimony at the hearing on the motion to reconsider, the Court retracted its finding approving the sale and finding that the purchaser was a good faith purchaser. *Id*. (citing *Wortley v. Chrispus Venture Capital, LLC (In re Global Energies, LLC)*, 763 F.3d 1341, 1350 (11th Cir.2014) (contemplating that a bankruptcy court can "revisit" a sale under § 363, reverse its finding of good faith and void the sale)).

Further, it is inherently inequitable that WAAG withstood significant scrutiny as a potential purchaser, but PureCycle withstood none. "In bankruptcy, the perception of a particular proceeding is often as important as the reality." *In re W.A. Mallory Co.*, 214 B.R. 834, 838 (Bankr.

12

E.D. Va. 1997). Interested parties in a bankruptcy proceeding should be entitled to rely on the information filed on the docket presented to the Court and deadlines set by the Court. Any interested party viewing the pleadings filed in this case would have concluded that any bidder on the Debtor's assets, including PureCycle, would be subject to the same standard of scrutiny that WAAG was under as the Stalking Horse, and that the bid must be timely in order for such scrutiny to occur.

Here, if the Court allows the sale to PureCycle to move forward, the Court would ultimately be fostering the perception that a party acting in good faith, with no reason to suspect or contemplate other bidders, forfeits its rights at the eleventh hour. The Court should instead foster an environment of transparency by allowing testimony and evidence concerning the status of all bidders in order to the make the statutorily required determination that the successful bidder is in fact a purchaser in good faith. Although maximizing the price of bankruptcy assets for the benefit of creditors is a key factor in all cases, the process employed in reaching that goal is of equal importance. The concerns raised in this case by the UST regarding the original sale process and more importantly, the good faith credentials of the Stalking Horse, is indicia of the scrutiny to which all bidders and sales should be subjected. There are circumstances where the Debtor and the Court should, in the interest of justice and to protect the sanctity of the sale process, be willing to tell prospective bidders in any sale that their money is no good and their bid cannot be considered.

2. **WAAG has sufficient evidence to demonstrate that PureCycle is not a good faith purchaser.**

Should the Court grant the motion to reconsider and stay the entry of the Sale Order, the Court would be able to hear testimony and consider evidence relevant as to whether PureCycle is a good faith purchaser. As set forth more fully in its Objection, (Doc. No. 81), and the Joint Statement of Dispute (Doc. No. 79), WAAG has relevant information for the Court concerning (1)

inside and confidential knowledge that PureCycle's representatives and/or owners had concerning WAAG's bid and strategy and improperly used in making the High Bid; (2) information concerning PureCycle's intentions related to the purchase of the Debtor's assets, which have the potentially to negatively impact the Estate even if the sale is approved; and (3) information concerning PureCycle's ability to use the assets of the Debtor once purchased. This information is relevant to the Court's determination as to whether PureCycle is a good faith purchaser.

It is well settled that "the misconduct that would destroy a purchaser's good faith status at a judicial sale involves fraud, collusion between the purchaser and other bidders or the trustee, or an attempt to take grossly unfair advantage of other bidders."); *In re Gunboat International, Ltd.,* 557 B.R. at 423 (citing *Willemain v. Kivitz,* 764 F.2d 1019, 1023 (4th Cir. 1984) (quoting *In re Rock Industries Machinery Corp.*, 572 F.2d 1195, 1198 (7th Cir. 1978)); *see also In re TMT Procurement Corp.*, 764 F.3d 512 (5th Cir. 2014) (following the same standard set forth in *Rock Industries Machinery Corp.*). "The requirement that a purchaser act in good faith ... speaks to the integrity of his conduct in the course of the sale proceedings." *In re Abbotts Dairies of Pennsylvania, Inc.,* 788 F.2d 143, 147 (3d Cir. 1986) (also following the standard in *Rock Industries Machinery Corp.*). "This includes the purchaser's actions in preparation for and during the sale itself. That is, the good-faith requirement prohibits fraudulent, collusive actions **specifically intended to affect the sale price or control the outcome of the sale**." *In re Gucci,* 126 F.3d 380, 390 (2d. Cir. 1997) (emphasis added); *see also In re Motors Liquidation Co.*, 430 B.R. 65, 79 (S.D.N.Y. 2010) (finding that bad faith conduct in negotiations warranted rejecting a bid). A court should not shy away from setting aside an approval sale when it is "tinged with fraud, error, or similar defects which would in equity affect the validity in a private transaction." *Id*. (quoting *Taylor v. Lake (In re Cada Invs.),* 664 F.2d 1158, 1162 (9th Cir.1981)).

14

Here, WAAG made a prima facie case that PureCycle, through David Pobiak, had insider information of the details of WAAG's bid through his membership interest in the Debtor and NanoPure. PureCycle was not even formed until July 15, 2020, well after WAAG's bid and all of the information concerning WAAG's bid had been made known to Pobiak. Even then, the Late Bid was not made for another two weeks. A bidder's knowledge of another bidder's strategy or basis for the bid may impact whether or not a bidder acts in good faith, and therefore, the Court should hear testimony about PureCycle's actions. Specifically, if allowed by the Court, WAAG would offer the following evidence concerning PureCycle's bad faith:

- PureCycle through Pobiak used confidential information about WAAG's strategy, available funding, and intentions concerning the assets in developing PureCycle's bid.

- The information used by Pobiak was not publicly disclosed by WAAG.

- The only reason that NanoPure and WAAG voluntarily disclosed confidential information to Pobiak concerning WAAG's bid and strategy was because Pobiak was subject to the confidentiality and non-disclosure agreement and he had fiduciary obligations that should have prevented him from wrongfully using the information obtained from NanoPure and WAAG.

- Unbeknownst to WAAG and NanoPure, at the time that Pobiak was receiving confidential and proprietary information from WAAG and NanoPure, Pobiak was already violating the very agreement that WAAG and NanoPure were relying on in conveying information about its bid to Pobiak.

- WAAG's modified bids that followed its original Stalking Horse bid took into account the fact that the waiver of Pobiak's claim and the future revenue stream were not included, and benefitted the Estate by being a straight cash offer.

- Because Pobiak and others breached the confidentiality and non-disclosure agreement, PureCycle has been temporarily enjoined in the State Court Action from proceeding with the Sale.

- The injunction and litigation in the State Court Action impacts the ability of PureCycle to comply with the bid, which impacts the overall benefit of the Late Bid to the Estate.

Further, WAAG has presented the Court with evidence concerning what PureCycle plans to do with the assets once purchased, something the UST and the Debtor presented on with respect to WAAG. Whereas WAAG's intentions as to the assets have been thoroughly explained to the

15

Court and other interested parties, PureCycle has stated only that it intends to purchase technology it plans to develop, even though no such assets exist and even though PureCycle may be prevented from complying with the bid, all of which will cause delay and harm to the Estate. (*See* Exh. 1 and 2.) WAAG is aware that the Court may have initially seemed uninterested in considering information about PureCycle's motivation for its bid, as its goal is of course to maximize the overall value to the Estate. However, courts have held that a bidder's motivation is part of the process of assessing good faith under the sound business judgment standard. *See In re Lionel*, 722 F.2d 1063 (2d Cir. 1983). In proposing a sale of the Debtor's assets outside the ordinary course of business, the Debtor-in-possession has the burden to establish the sound business reasons for a proposed sale, which includes proving that there was no improper or bad motive on the part of the bidder. *In re Castre, Inc*., 312 B.R. 426, 428 (Bankr. D. Colo. 2004); *In re Moreno*, 554 B.R. 504, 510 (Bankr. D.N.M. 2016); I*n re Allen*, 607 F. App'x 840, 843 (10th Cir. 2015).

WAAG is informed and believes that the evidence provided to the Court will not result in the Court unnecessarily hearing a "he said/she said" dispute between the interested parties that has no bearing on the sale of the Debtor's assets. Instead, the evidence WAAG seeks to offer goes to the heart and integrity of the sales process under section 363. There is nothing unfair or prejudicial to PureCycle in having to defend and present evidence concerning its good faith status, as it is an essential element of section 363 for the Court to make a determination that Pure Cycle is a good faith purchaser.

**3.    If the Court cannot make findings as to the Assets sold, or determines that the dispute between WAAG and PureCycle has rendered this sale process ineffective for maximizing the benefit to the Estate, the Sale Motion should be denied altogether.**

In the Sale Order, the Court makes several references to the fact that it is unclear to the Court whether the Batelle License is an asset of the Debtor and whether it is being purchased by

PureCycle. As explained above it is WAAG's position that the Batelle License belongs to NanoPure, and WAAG has evidence that the Debtor consented to the transfer of the license to NanoPure. PureCycle has represented to the court through counsel that it intends to use the Debtor's assets, including the Batelle License. To the extent that the Court cannot determine from the sale documents and pleadings filed to date whether or not the Debtor is purporting to sell the Batelle License, the Court should decline to approve the sale to anyone, including WAAG and PureCycle. Further, to the extent that the Court has concerns that the dispute between WAAG and Pure Cycle overly complicates that the sale of the Debtor's assets, it may be in the best interests of the Estate for this Sale Motion to be denied due to issues involved. Instead, perhaps the sale of the Debtor's assets should occur pursuant to a properly approved disclosure statement and confirmed plan, so that the Court, potential bidders, creditors, and other interested parties can rely on an approved disclosure statement in voting to confirm a plan that approves a sale of the Debtor's assets.

## CONCLUSION

Based on the foregoing, WAAG requests that the Court reconsider the Sale Order, reconsider the original bid of WAAG, and grant such other and further relief as the Court may be just and proper.

*[signature on following page]*

HSB 6364325 v.1

August 17, 2020

        **HAYNSWORTH SINKLER BOYD, P.A.**

        **By:**   <u>/s/ Mary M. Caskey</u>
        Stanley H. McGuffin
           District ID No. 2833
        Mary M. Caskey
           District ID No. 10120

        Post Office Drawer 11889
        Columbia, South Carolina 29211
        (803) 779.3080 Tel
        (803) 765.1243 Fax
        smcguffin@hsblawfirm.com
        mcaskey@hsblawfirm.com
        Attorneys for Watertech Asset Acquisition Group, LLC