# UNITED STATES BANKRUPTCY COURT
## DISTRICT OF SOUTH CAROLINA

In re:

Watertech Holdings, LLC,

Debtor.

Case No. 20-00662-jw

Chapter 11 (Small Business)

---

## SMALL BUSINESS DEBTOR'S COMBINED PLAN OF LIQUIDATION AND DISCLOSURE STATEMENT

Filed by the Debtor-in-Possession on August 21, 2020

---

**Submitted by**:  McCARTHY, REYNOLDS, & PENN, LLC
G. William McCarthy, Jr., I.D.#2762
Daniel J. Reynolds, Jr., I.D.#9232
W. Harrison Penn, I.D.#11164
*Attorneys for the Debtor*
1517 Laurel Street (29201)
P.O. Box 11332
Columbia, SC 29211-1332
(803) 771-8836
(803) 765-6960 (fax)

## Table of Contents

|  |  | Page |
|---|---|---|
| Article I | History and Other General Information Relating to the Proposed Plan of Liquidation | 4 |
| Article II | Plan of Reorganization | 14 |
|  | Plan Classifications | 15 |
| Article III | Feasibility of Plan and Means of Effectuation | 19 |
| Article IV | Conditions Precedent and Implementation of the Plan | 19 |
| Article V | Claims Bar Date, Claims Objections, and Post-Confirmation Status | 20 |
| Article VI | Executory Contracts | 21 |
| Article VII | Tax Consequences | 22 |
| Article VIII | Jurisdiction | 25 |
| Article IX | Post-Confirmation Acts | 26 |
| Article X | Cram-Down for Impaired Creditors Not Accepting the Plan | 26 |
| Article XII | Discharge of the Debtor | 26 |

## SMALL BUSINESS DEBTOR'S COMBINED PLAN OF LIQUIDATION AND DISCLOSURE STATEMENT

This Combined Plan of Reorganization and Disclosure Statement is presented to you to inform you of the proposed Plan for liquidating the assets of Watertech Holdings, LLC ("Debtor"), and to seek your vote to accept the Plan.

You are encouraged to carefully review the full text of this document, including all exhibits and attachments, before deciding how to vote on the Plan. To assist you in your review, please note that a list of definitions and a section of frequently asked questions appear at the end of this document.

**IN ADDITION TO CASTING YOUR VOTE TO ACCEPT OR REJECT THE PLAN, YOU MAY OBJECT TO THE ADEQUACY OF THE DISCLOSURES MADE IN THIS DOCUMENT, OR YOU MAY OBJECT TO THE TERMS OF THE PROPOSED PLAN. IF YOU WISH TO OBJECT TO THE ADEQUACY OF THE DISCLOSURES OR TO THE TERMS OF THE PROPOSED PLAN, YOU MUST DO SO BY _____ _____.**

**YOUR BALLOT STATING HOW YOU ARE VOTING ON THE PLAN MUST BE RETURNED BY _____. THE BALLOT MUST BE MAILED TO THE CLERK OF COURT FOR THE UNITED STATES BANKRUPTCY COURT FOR THE DISTRICT OF SOUTH CAROLINA AT <u>1100 LAUREL STREET, COLUMBIA, SC 20291</u>.**

**A HEARING ON THE CONFIRMATION OF THE PLAN IS SCHEDULED FOR _____ AT_____.**

Your rights may be affected by this Combined Plan and Disclosure Statement. You should consider discussing this document with an attorney.

Watertech Holdings, LLC (the "Debtor") hereby files its Combined Plan of Liquidation and Disclosure Statement (the "Plan"), which the Debtor believes and asserts contains adequate information for Claim and Equity holders to make a decision on the Plan. The Plan and its Exhibits, including any amendments or addendums hereto, are hereby specifically incorporated in this Plan by reference.

# ARTICLE I

## History and Other General Considerations Relating
## to the Plan of Liquidation

1.    **Filing of the Debtor's Chapter 11 Case.**    The Debtor filed its voluntary petition for relief under chapter 11 of the Bankruptcy Code on February 6, 2020 (the "Petition Date"). The Chapter 11 case is pending in the Bankruptcy Court in Charleston, South Carolina. The Debtor is operating its business and managing its assets as a debtor in possession pursuant to §§ 1107(a) and 1108 of the Bankruptcy Code.

2.    **Nature of the Debtor's Business.**    The Debtor is in the business of developing emerging technologies in the areas of micro-aerosol distribution of nanoparticles, micro-bubble distribution of nanoparticles, and algae growth.

3.    **Legal Structure and Ownership**.    The Debtor is a manager managed limited liability company organized under the laws of the state of South Carolina. The Debtor is co-managed by Bob Fei and Keith Johnson. The membership interests in the Debtor are detailed in Debtor's Amended List of Equity Security Holders attached as **Exhibit A** and incorporated by reference.

4.    **Debtor's Assets.**    As of the Petition Date, the Debtor's assets consist primarily of intellectual property rights, potential causes of action, tradress, and goodwill. Specific detail regarding the Debtor's book value for these assets is disclosed on the Amended Schedule A/B filed by the Debtor on May 6, 2020 [Docket No. 60], which is incorporated herein by reference. The Amended Schedule A/B disclose: (i) investments with a book value of $500,000 in the form of the Debtor's 5% ownership of stock in NABAS Group, Inc. ("NGI"); (ii) a note receivable from NGI with a face value of $650,000; (iii) intangibles and intellectual property consisting of Patent No.: US 10,588,992 B2 with a book value of $200,000, a trademark for the Mag-50 device name valued at $10,000, a license with NanoPure Technologies, LLC with a book value of $649,400; and (iv) unliquidated and contingent claims against NanoPure/GFS Mold for breach of contract, and unliquidated and contingent claims against Barron Algae and Glenn Barrett.

NGI, like the Debtor, is a speculative startup company seeking to develop new technologies to bring new products to market. The Debtor's management believes that the cost in legal fees to pursue collection of the amounts owed under the NGI promissory note will likely outstrip any value that may be realized by collection efforts.

The US patent which was awarded to the Debtor post-petition are for less than what was sought in the Debtor's applications. The subject of the patent application that went beyond the nozzle design, was denied patent protection by the USPTO. The Debtor's trademark of the name

Mag-50 is of limited value to any party seeking to utilize that name in trade.

The unliquidated claims against NanoPure/GFS Mold, along with Barron Algae and Glenn Barrett originate with the Debtor's conveyance of intellectual property rights licensed by the Debtor from Battelle Memorial Institute ("Battelle") in 2015, and subsequently conveyed by the Debtor to NanoPure in 2017. While there have been mutual disputes between the Debtor and NanoPure as to the performance of the contracts between them, it is clear that the parties intended for an immediate and irrevocable transfer of the Battelle License and that the Debtor was paid valuable consideration for that transfer. The Debtor's management believes that the pursuit of litigation with NanoPure, GFS Mold, Barron Algae, and Glenn Barrett would be a significant expense to the Estate with little certainty for recovery.

5. **Debtor's Liabilities.** There are no secured claims or priority unsecured claims against the Debtor's Estate. As of the Petition Date, the Debtor believes it owes roughly 32 of its third-party general unsecured creditors the approximate amount of $1,156,000. The Debtor listed all of its trade vendors, including those that are not believed to have a claim, in its schedules for notice purposes. The Debtor also owes general unsecured debts to 10 members who made loans to the Debtor to cover operations totaling approximately $1,053,000. A more complete description of Debtor's liabilities may be found below in the discussion of Class 1 and Class 2 under this Plan.

6. **Current and Historical Financial Condition.** The Debtor's financial condition as of the Petition Date is detailed on its Schedule A/B [Docket No. 59], which reflects that the Debtor had no cash as of the filing of its petition for relief under Chapter 11 of the Bankruptcy Code. The Debtor's pre-petition balance sheet is attached as **Exhibit B**. As shown on the Debtor's balance sheet, the Debtor was only able to pay its employees and expenses through the sale of all remaining inventory and equipment in the last financial quarter of 2018 and from loans provided to the Debtor by its members.

As reflected in the Debtor's Monthly Operating Reports, the Debtor has had no income from business operations since the Petition Date.

Post-petition, the Debtor has obtained relief from this Court in the form of an Order approving the sale of substantially all of the Debtor's assets to PureCycle, LLC ("PureCycle") for a non-contingent all cash purchase price of $525,000 and the waiver of the claim of David Pobiak, a member of the Debtor with an interest in PureCycle. The $525,000 from PureCycle is currently escrowed with counsel for the Debtor awaiting further order from the Bankruptcy Court upon approval of this Plan of Liquidation.

7. **Events Leading to the Filing of the Bankruptcy Case.** The Debtor was formed on September 18, 2014 to develop products develop disinfecting technologies, which

lead to the intellectual property rights obtained through and Exclusive Patent License Agreement between the Debtor and Battelle Memorial Institute ("Battelle"). Debtor's License Agreement with Battelle is dated February 16, 2015 (the "Battelle License"). The Debtor initially operated as Watertech Equipment & Sales, LLC and developed technologies in the dispersion of nanoparticles through micro-aerosol and micro-bubble systems, and developed proficiencies in algae growth. The Debtor rapidly attracted investment as a startup due to the spread of the Ebola Virus and the attention that the virus attracted in the media and public consciousness. However, despite significant investment and some success in the laboratory, the Debtor was never able to bring products to market. In 2017, the membership of the Debtor lost faith in its then Manager and CEO, Glenn Barrett, as the Debtor became unable to support its operations.

The Debtor entered into a series of transactions with the entity now known as Paerosol, f/k/a NanoPure, LLC, NebuPure Technologies, LLC, GFS Mold, LLC (collectively, "NanoPure"), that transferred the Debtor's interest in the Battelle License to NanoPure. While there have been mutual disputes between the Debtor and NanoPure as to the performance under the contracts between them, it is clear that the parties intended for an immediate and irrevocable transfer of the Battelle License and that the Debtor was paid valuable consideration for that transfer. A timeline for the Battelle License reflects:

- **February 16, 2015** the Debtor, then known as Watertech Equipment & Sales, LLC, obtained an exclusive patent license agreement from Battelle for micro-aerosol disinfecting technology. The Battelle License provides the Debtor the right to sublicense out the license with the consent of Battelle.

- **December 12, 2016**, the Debtor became Watertech Holdings, LLC.

- **May 17, 2017**, GFS Mold, LLC was organized.

- **March 31, 2017**, an exclusive patent sublicense agreement was executed between the Debtor and GFS Mold for the use of the micro-aerosol for mold remediation only.

- **April 21, 2017**, the Debtor indicates it owns a patent application title Aerosol Device (patent application # 15/494,217), not related to the Battelle license.

- **May 24 2017**, Debtor executes the first amendment to Exclusive Patent License Agreement with Battelle regarding the assignment and sublicensing of its license.

- **November 1, 2017**, Debtor executed the Exclusive Patent Sublicense Agreement for all Intellectual Property (all Patents, Trade Secrets, the Battelle License, Aerosol Device, et al. related to the disinfection of pathogens on surfaces and in the air). Debtor's grant to GFS Mold is exclusive, irrevocable and perpetual. The parties' rights can be assigned only with the other party's consent, and with Battelle's consent.

6

- **November 13, 2017**, GFS Mold changes its name to NebuPure Technologies, LLC.

- **December 12, 2017**, executed on January 12, 2018, Battelle executes the Amended and Restated License Agreement # 527277, also referred to the Exclusive Patent License Agreement, in favor of NebuPure Technologies, LLC.

- **December 27, 2017**, Debtor executed a consent form authorizing the transfer of the Battelle License from the Debtor to NebuPure Technologies, LLC.

- **January 24, 2018**, the Debtor and GFS Mold modified the terms of the Exclusive Patent Sublicense Agreement.

- **January 26, 2018**, NebuPure Technologies, LLC changes its name to NanoPure, LLC.

- **March 26, 2020**, NanoPure, LLC changed its name to Paerosol Group, LLC.

Having conveyed the Battelle License, the Debtor sought to obtain value from the knowledge it had in the water remediation business.  In early 2018, the Debtor solicited bids from NanoPure and a company known as Barron Algae operated by Glenn Barrett, the Debtors former manager, for all remaining assets.   With term sheets from both NanoPure and Barron Algae for the purchase of all remaining assets, the Debtor organized a meeting of the members to seek approval of its asset sale on September 6, 2018.  The Debtor's members were unable to reach a majority decision and the member meeting resulted stalemate.

In early 2019, the Debtor marketed itself to entities known to have an interest in the Debtor's assets.  Through this effort, the Debtor entered into a Term Sheet to sell its assets to Argus Group, LLC over the competing bid of NanoPure.  Argus never presented the Debtor with an asset purchase agreement nor did Argus fund the earnest money proposed in its Term Sheet with the Debtor.  The Debtor then returned to NanoPure and entered into a term sheet for the sale of its remaining assets, subject to Bankruptcy Court approval under § 363.  The Debtor held a membership meeting in November 2019 to inform its members of the terms with NanoPure and the intent to seek Bankruptcy Court approval of the sale.  In January 24, 2020, the Debtor signed its Asset Purchase Agreement with Watertech Asset Acquisition Group, LLC ("WAAG") and began the process of filing Chapter 11 to obtain approval for the sale of its remaining assets pursuant to § 363 of the Bankruptcy Code.

8.    **Significant Events During the Bankruptcy Case**.  The following significant events have occurred during the pendency of the Debtor's case:

      a.    *Employment of Professionals*.  The Debtor prepared applications and obtained Court approval for McCarthy, Reynolds, & Penn, LLC to serve as Debtor's Counsel in this proceeding.  The Debtor also obtained approval for Cherry Bekaert to serve as Accountants to prepare and file tax returns on behalf of the Debtor.

      b.    *Initial Debtor Interview and Meeting of Creditors.*  The Debtor's Initial Debtor Interview ("IDI") was held with the Office of the United States Trustee on March 5, 2020. Following an initial continuance to address the COVID-19 pandemic, the Debtor's Meeting of Creditors was held telephonically on March 19, 2020.

      c.    *Sale Motion and Bid Procedures Order.*  The Debtor's Sale Motion, as filed on March 2, 2020, was initially supported by a pre-petition Asset Purchase Agreement (the "Stalking Horse APA") with WAAG, seeking a sale free and clear of liens, claims, and encumbrances pursuant to 11 U.S.C. § 363.  The Sale Motion proposed a purchase price of $125,000, which consisted of $115,000 in cash upon closing and $10,000 of earnest money that was expended by the Debtor pre-petition in due diligence to maintain a patent application, and the post-closing payments from the assignment of five percent (5%) of the net-profit from WAAG for a period of five (5) years not to exceed $250,000 as well as a proposal to waive certain creditor claims in the proposed amount of $976,200.

      Along with the Sale Motion, the Debtor filed a Motion for Order Establishing Bidding and Other Procedures in Connection with the Sale of Assets of the Debtor and Granting Protections to WAAG, its stalking horse bidder ("Bid Procedures Motion").  Objections to the Debtor's Bid Procedures Motion were filed by the United States Trustee ("UST") [Docket No. 34]; Colette Winters [Docket No. 48]; Dennis Avery, Rick M. Crosby, Malcom Fages, and Kenneth Metzger [Docket No. 40].  The objections of parties related to Bid Procedures were resolved by the Consent Order on Bid Procedures entered on April 15, 2020 [Docket No. 51].

      On June 26, 2020, the Debtor received the First Amended and Restated Asset Purchase Agreement ("WAAG Amended APA") from WAAG.  The WAAG Amended APA removed the claim waivers in the approximate amount of $801,000, removed payments from contingent future profits of WAAG, and increased the cash closing price to $250,000.  The WAAG Amended APA was never approved by the Court and no amended order modifying the bid procedures was entered by the Court.  The Debtor also received an email expressing an intent to bid from counsel for another entity, Argus Group, on or before July 1, 2020.

      The Debtor received a proposed Asset Purchase Agreement from Argus Group (the "Argus Group APA") prior to 10:30 A.M. on July 8, 2020.  Despite the language of the Argus Group APA, the Argus Group APA was materially different from the Stalking Horse APA based

upon contingencies that it contained.  The Argus Group APA was never supported by a $125,000 earnest money deposit.  The Argus Group APA was not compliant with the Bid Procedures Order.

On July 21, 2020, WAAG submitted a Second Amended and Restated Asset Purchase Agreement ("Second Amended WAAG APA") for the purposes of describing the assets being purchased with greater specificity.  The Second Amended WAAG APA did not change the proposed price or proposed payment terms the APA presented on June 26, 2020.

On July 31, 2020, the Debtor received a proposed Asset Purchase Agreement from PureCycle, LLC (the "PureCycle APA") along with an earnest money deposit in the amount of $125,000.  The PureCycle APA was non-contingent and identical to the Amended WAAG APA in all material respects, only modifying the name of the purchaser, the purchase price, and shortening the period between entry of the Sale Order and closing of the transaction with the Debtor.  The PureCycle APA was not compliant with the Bid Procedures Order in terms of when it was received by the Debtor, but compliant with all other provisions and requirements.

d.    *The Sale Hearing*.  The UST's objection to Bid Procedures [Docket No. 34] also objected to Debtor's Sale Motion seeking further detail regarding the Debtor's assets being sold, detail regarding the connections of WAAG to NanoPure, and questioned the appropriateness and validity of any post-closing payments and claim waivers that were included as terms of the Stalking Horse APA.  Ms. Winters also objected to the Sale Motion to the extent that she had not consented to any waiver of claims belonging GFS, in which she had an interest through her divorce settlement with Mr. Alderson.  Additionally, Ms. Winters argued that the transaction proposed by the Sale Motion was not negotiated at arm's length.  Objections as to the Sale Motion filed by the UST and Ms. Winters were resolved through the stipulation of exhibits and the proffer of testimony of Bob Fei and Steven Gareleck, read into the record by Debtor's Counsel at the Sale Hearing.

On August 5, 2020 at 1:00 PM, attorneys and business representatives for WAAG and PureCycle appeared to bid at the Sale Hearing.  Argus Group did not participate at the Sale Hearing.  WAAG presented its bid of $250,000 and PureCycle presented its bid of $275,000.  Since Debtor has insisted that the Stalking Horse bid be non-contingent, all cash, and an immediate closing and since the competing PureCycle bid met those same requirements,

argument of counsel centered on the propriety of the Debtor accepting bids not strictly complaint with the timing provisions of the Bid Procedures Order.

At the Sale Hearing after consultation with WAAG and PureCycle, Debtor's counsel represented that in keeping with the Debtor's fiduciary duties to estate creditors and the business judgment of the Debtor's management based upon the certainty of substantially higher offers in competitive bidding, it desired that the Court exercise its authority under the Bid Procedures Order to treat the PureCycle APA as a Qualified Competing Bid.

The Court, having accepted the Debtor's exercise of its fiduciary duty, allowed the bidding to be opened. PureCycle increased its bid to $375,000 and waived Mr. Pobiak's creditor claim. WAAG increased its bid to $400,000 but chose not to waive any creditor claims associated with its bid. Bidding continued with a bid of $425,000 from PureCycle and concluded with a bid of $500,000 from WAAG, which was exceeded by a final bid from PureCycle of $525,000. WAAG was given a chance to bid, chose not to do so, and chose not to be treated as a backup bidder in the event PureCycle failed to close on its bid.

The terms of the PureCycle bid include the following provisions. PureCycle agreed to pay an all cash purchase price of $525,000 (the "Purchase Price"). The sale to PureCycle is non-contingent and not subject to any further due diligence investigation. The claim of David Pobiak, a member of PureCycle, against the Debtor's Estate is waived and will receive no distribution. Funds sufficient to pay the Purchase Price will be placed in escrow with Debtor's counsel within 24 hours of the Sale Hearing. The closing of this sale shall occur within ten (10) days of this order becoming a final order not subject to appeal.

     9.    **Projected Recovery of Avoidable Transfers.** The Debtor does not intend to pursue preference, fraudulent conveyance, or other avoidance actions.

     4.    **Definition**s. The following words, terms and definitions shall be used and apply exclusively for this Plan:

          a.    <u>Acceptance</u>. A specific class of claims has accepted a plan when such plan has been accepted by <u>those</u> <u>voting</u> individual creditors in that class that hold at least two-thirds (2/3) in amount (of money) and more than one-half (1/2) in number (greater than 50%) of the <u>voting</u> individual allowed claims of that class of creditors. A class of interest has accepted a plan if such plan has been accepted by holders of such interest that hold at least two-thirds (2/3) in amount of the allowed interest of such class held by holders of such interest (i.e., number of shares held by shareholders or partners) <u>that have voted</u> in confirmation of such plan. <u>It is important to note that computation in the confirmation voting process</u>

is based only upon the total amount of claims actually voting rather than on claims proven and allowed. Notwithstanding any other provision of this section, a class that is unimpaired under this Plan is deemed by law to have accepted this Plan, and solicitation of acceptances with respect to such class is not otherwise required.

b.    Allowed Claim shall mean each individual creditor's claim or claim of interest whose validity is accepted by the Debtor for payment, or if challenged by the Debtor, a claim which is ultimately proved by the claimant and approved by the Court after notice. Some claims by law can be approved only by the Court for payment, e.g., administrative and priority claims.

c.    Cash on Hand shall refer to that cash available, on or immediately after confirmation, and which is in the hands of the Debtor, and has been derived from the total operations of the Debtor.

d.    The Case shall mean chapter 11 case no. 20-00662-jw and shall generally refer to the proceedings of the Debtor under this chapter 11, which Case commenced in this Court on February 6, 2020.

e.    Chapter 7 shall mean a hypothetical case administered under 11 U.S.C. Sections 701 et seq., wherein an estate, identical to the Debtor's, with identical assets and liabilities, has its assets liquidated.

f.    Chapter 11 shall mean a case being administered under 11 U.S.C. Sections 1101 et seq., for the reorganization or liquidation of the indebtedness of a debtor, and the continued operation of its business.

g.    A Claim of Interest or "Equity Interest" (more particularly) shall mean any claim for equity ownership, whether actual, or contingent. "Interest" refers to equity securities (shareholders' interest), partnership interest or proprietorship interest.

h.    Claims shall mean any right or claim to a right to receive payment of monies from the Debtor or right to an equity interest in the Debtor held by any party.

i.    Claims Bar Date shall mean the last day for filing Claims or a Claim of Interest against the Debtor's estate in this Case. Unless otherwise ordered by the Court, the Claims Bar Date was June 17, 2020 for all creditors except governmental units and shall be August 4, 2020 for a governmental unit as such dates were set forth in the Court's Notice of Chapter 11 Bankruptcy Case, Meeting of Creditors, & Deadlines issued on the Petition Date in this Case.

j.    Class of Claims shall mean all types of claims or interests (e.g., secured, priority, unsecured or Claims of Interest) which are substantially identical in kind or nature and are grouped together without any unfair discrimination or treatment for payment by this Plan.

k.    The Code is 11 U.S.C. Sections 101, et seq., also referred to as the "Bankruptcy Code".

l.  <u>Confirmation</u> of this Plan shall be effective when the signed Order Confirming Plan is filed by the Court to implement the proposed Plan, after the Court has found that the Plan:  (1) has been accepted by the requisite number of creditors and parties in interest eligible to vote thereon, (2) is feasible, (3) is fair and equitable, (4) does not unfairly discriminate, and (5) meets all of the other requirements of 11 U.S.C. Sections 1123, 1126 and Section 1129, and the Order Confirming Plan is entered.

m.  The <u>Court</u> shall mean the United States Bankruptcy Court for the District of South Carolina.

n.  The <u>Debtor</u> shall mean Watertech Holdings, LLC, the debtor in Chapter 11 Case No. 20-006620-jw.

o.  The <u>Disclosure Statement</u> shall mean this combined Plan and Disclosure Statement filed on July 29, 2020, including any subsequent amendments or addendums thereto.

p.  The <u>"Effective Date" or "Effective Date of Confirmation"</u> for cash distribution purposes as it is referred to in this Plan, shall mean the day that is twenty (20) days after entry of the Court's Order Confirming Plan unless any Order Confirming Plan shall be appealed, in which case the Effective Date shall be the day after any Order Confirming Plan shall become a final, unappealed order.

q.  <u>Executory Contracts</u> shall mean all contracts or agreements with duties owing by each of the parties to such contracts or agreement, which duties remain to be performed or satisfied by the parties in the future.

   i.  <u>Personalty</u> <u>Leases</u> shall mean all leases between the Debtor and third parties for the use of any and all personal property.

   ii.  <u>Realty</u> <u>Leases</u> shall mean all valid, enforceable leases of real estate between the Debtor and other parties.

r.  <u>Final Consummation</u> shall refer to the date and time at which the execution of all provisions of the Plan, appropriate requirements of the Bankruptcy Code, and applicable supplemental orders issued by the Bankruptcy Court have been fully complied with and accomplished.

s.  An <u>Impaired</u> class shall mean a class of claims given, under this Plan, less than the full amount of their filed and approved individual claims or claims where contract rights are modified or compromised by the Plan.

t.  <u>Net Sales Proceeds</u> shall mean the amount of sales proceeds remaining from the sales of real property after the payment of all commissions, attorney's fees, and other closing costs <u>and</u> payment of the Debtor's management and operational expenses.  Post-Confirmation, Net Sales Proceeds are those proceeds remaining after payment of any and all claims and costs in Classes 1 - 4 of the Plan as outlined in Article III of the Plan.

u.  The <u>Petition Date</u> shall mean the date on which this Case was filed with

12

the Court, February 6, 2020.

v. The <u>Plan</u> shall mean this Debtor's Combined Disclosure Statement and Plan of Reorganization under chapter 11, filed with the Court on July 29, 2020, including any subsequent amendments or addendums thereto.

w. <u>Priority and Administrative Claims</u> shall mean all claims entitled to priority status under 11 U.S.C. Section 507 and Section 364 or other specific provisions of the Code.  These claims include, but are not limited to, generally, all costs and expenses incurred during the liquidation or reorganization proceeding; all wages allowed priority status which were owing by the Debtor at the time of filing up to $13,650 per claimant; all post-petition wage claims due at confirmation; all taxes owing to the United States, any individual State or local taxing authority; all post-petition debts incurred and unpaid since the commencement of this Case; and all other statutory costs or fees assessed or assessable by the Court, and any claims given priority status during this proceeding by specific order of the Court.

x. <u>Secured Claim</u> shall mean each individual claim completely or partially secured by real estate mortgages, security agreements, assignment agreements, consignment agreements, chattel mortgages, recorded lease-purchase agreements, liens or any other legal encumbrance which is entitled to secured status under Title 36 of the Code of Laws of South Carolina (UCC provisions) or South Carolina law.

y. <u>Substantial Consummation</u> shall refer to that date and time on which the transfer of all or substantially all of the property proposed by the Plan to be transferred has been achieved; the assumption by the Debtor under the Plan of the business or of the management of all or substantially all of the property dealt with by the Plan has been achieved; and, finally, the commencement of the distribution of some payments under the Plan has begun.

z. An <u>Unimpaired</u> class shall mean a class of claims whose rights are not affected by this Plan, or which is entitled to and shall receive under this Plan full satisfaction of its filed and Allowed Claims as required by the Code.  Unimpaired claims are deemed to have accepted this Plan by specific provision of the Code and solicitation of acceptances with respect to such class from the holders of claims or interest of such class is not required.

aa. <u>Unsecured Claims</u> shall mean all claims against the Debtor other than Secured Claims, Priority and Administrative Claims, or Claims of Interest.

 **NOTE:**  <u>The defining of the various parties of interest and claimants against this estate in no way imputes any relative priority among them nor is it to be construed to validate or approve any of their claims.  Any and all terms not defined hereinabove shall be read to have the meanings specifically set forth herein below or to otherwise have their most common every day meaning where definitions are not specifically set forth herein.</u>

## ARTICLE II

### Plan of Liquidation

Unless otherwise ordered by the Court, the Claims Bar Date was **June 17, 2020 for all creditors except governmental units** and was **August 4, 2020 for a governmental unit** as such dates were set forth in the Court's Notice of Chapter 11 Bankruptcy Case, Meeting of Creditors, & Deadlines issued on the Petition Date in this Case. Unless specifically ordered otherwise by the Court, only Claims scheduled by the Debtor without any contingent, unliquidated, or disputed notations and those Claims filed on or before the Claims Bar Date shall constitute Claims asserted against the Debtor in this Case. Any Claims filed after the Claims Bar Date shall be automatically disallowed unless the claimant successfully obtains an order of the Court allowing their late-filed proof of claim. Any claim for United States Trustee fees is not subject to any deadline for administrative claims. **The Debtor specifically reserves its right to object to any scheduled or asserted claims prior to the closing of the bankruptcy case.**

The Debtor's ultimate goal is to liquidate its remaining assets to provide the maximum recovery to creditors of this Chapter 11 Estate. The Debtor has created this recovery through the sale of substantially all of its assets pursuant to the Debtor's Motion for Order Authorizing the Sale of Assets of the Debtor Free and Clear of Liens, Claims, Encumbrances, and other Interests Pursuant to 11 U.S.C. § 363 ("Sale Motion") filed on March 2, 2020 [Doc 6]. On August 14, 2020 the Court entered its Order Authorizing the Sale of Assets of the Debtor Free and Clear of Liens, Claims, Encumbrances, and Other Interests Pursuant to § 363 ("Sale Order") approving the sale of the Debtor's assets to PureCycle. [Docket No. 97]. This asset sale to PureCycle provides sale proceeds in the gross amount of $525,000 for distribution to the holders of Allowed Claims.

WAAG has filed a Stay Motion [Docket No. 86] seeking to stay the sale to PureCycle while the Court makes a determination of WAAG's Motion to Reconsider the Sale Order [Docket No. 99]. WAAG's Stay Motion and Motion to Reconsider have been scheduled for a hearing at 10:00 AM on August 26, 2020 at the Bankruptcy Courthouse in Columbia, South Carolina. In its Motion to Reconsider, WAAG submits that it if its Motion to Reconsider is granted, WAAG will proceed to purchase the Debtor's assets in a sale that provides gross proceeds in the amount of $500,000 for distribution to the holders of Allowed Claims.

## Plan Classifications

**Class 1.**            **General Unsecured Creditors.   Unsecured, Impaired.**

Class 1 consists all creditors, who are not members of the Debtor, that are holders of Allowed Claims.  The maximum amount of all Class 1 claims that could be allowed is $919,795.  However, the Debtor believes that pursuant to its claim analysis, the appropriate amount for all claims in Class 1 is $571,078.  The holders of Class 1 claims will be paid a *pro rata* distribution from the proceeds from the sale of Debtor's assets.  The Class 1 claims are as follows:

1. 3D Systems, Inc. should have an allowed Class 1 claim in the amount of $92,600.

2. Aerosol Research & Engineering Labs claim should be allowed in the amount scheduled by the Debtor of $12,616.

3. Albemarles Point Center was scheduled as a disputed claim by the Debtor in the amount of $268,496.30.  This claim will be subject to an objection by the Debtor pursuant to § 502(b)(6).  The Debtor proposes an Allowed Claim for Albemarles Point Center, the Debtor's former landlord, in the amount of $40,274.45.

4. AT&T Mobility should be paid an Allowed Claim in Class 1 of $552.29.

5. AT&T Phone should be paid an Allowed Claim in Class 1 of $916.33.

6. Auburn University Poultry Science Department had a disputed claim scheduled by the Debtor in the amount of $14,550.  This claim is disputed by the Debtor because the services contracted for were never provided.  This claim should be expunged from the claims register and receive no distribution.

7. Bank of America has a claim scheduled by the Debtor in the amount of $351.26.  Upon the closing of this account, Bank of America credited auto-drafts for services back to the Debtor establishing an amount due of $0.  This claim should be expunged from the claims register and receive no distribution.

8. Carolina Fluid Components should be paid an Allowed Claim in Class 1 of $2,394.16.

9. Charleston Imaging Products should be paid an Allowed Claim in Class 1 of $78.07.

10. Charleston Telecom Solutions should be paid an Allowed Claim in Class 1 of 147.59.

11. Charleston Water System should be paid an Allowed Claim in Class 1 of $811.11 based upon Proof of Claim 1 on the Claims Register.

12. Charter Communications should be paid an Allowed Claim in Class 1 of $144.40.

13. Cherry Bekaert was scheduled by the Debtor in the amount of $8,400. This claim is based upon pre-petition accounting services provided to the Debtor. This claim was waived by Cherry Bekaert pursuant to the Application and Order Appointing Cherry Bekaert as Accountants for the Bankruptcy Estate. Cherry Bekaert's post-petition claim is addressed in Class 3 below.

14. Clean Strike, LLC was scheduled by the Debtor in the amount of $0 and shall receive no distribution.

15. Comcast should be paid an Allowed Claim in Class 1 of $221.81.

16. Cowan Strategies should be paid an Allowed Claim in Class 1 of $50,950.79.

17. Detection Tek Holdings should be paid an Allowed Claim in Class 1 of $3,150.

18. DMR Consulting, LLC should be paid an Allowed Claim in Class 1 of $20,233.70.

19. Etowah Group should be paid an Allowed Claim in Class 1 of $20,000.

20. Fish & Richardson, PC should be paid an Allowed Claim in Class 1 of $43,517.50.

21. Florence Darlington Tech was scheduled as a disputed claim by the Debtor in the amount of $45,654.05. Based upon the services actually provided, the Debtor plans to object and proposes to reduce this claim and allow it in the amount of $16,971.33 as a Class 1 creditor.

22. Forager Systems was scheduled by the Debtor in the amount of $15,300. Forager Systems filed Proof of Claim 7 inappropriately classifying this debt as a priority claim. Debtor will object to this claim and seeks to reclassify the claim so it can be an Allowed Claim in Class 1 of $15,300.

23. Greenacre Ventures was scheduled as a disputed claim in the amount of $38,750. The Debtor objects to this claim and believes it should be expunged from the claims register.

24. Mark Peterson should be paid an Allowed Claim in Class 1 of $1,131.20.

25. McMaster-Carr should be paid an Allowed Claim in Class 1 of $2,133.49.

26. Mulholland Consulting, LLC should be paid an Allowed Claim in Class 1 of $20,154.30.

27. NC State Student Centers should be paid an Allowed Claim in Class 1 of $100.

28. Oilfield Labs of America, LLC should be paid an Allowed Claim in Class 1 of $2,340.

29. Preferred Logistics should be paid an Allowed Claim in Class 1 of $1,058.35.

30. Rogers & Brown Custom Brokers should be paid an Allowed Claim in Class 1 of $215.

31. Service Master NCR should be paid an Allowed Claim in Class 1 of $362.80.

32. Silicon Harbor Communications should be paid an Allowed Claim in Class 1 based on Poof of Claim 5 in the amount of $25,410.10.

33. Technology Sciences Group, Inc. should be paid an Allowed Claim in Class 1 of $1,140.

34. The Austin Strategy Group should be paid an Allowed Claim in Class 1 of $16,800.

35. UEC Electronics, LLC should be paid an Allowed Claim in Class 1 of $25,132.14.

36. University of South Carolina Contract & Grant was scheduled as a disputed claim by the Debtor in the amount of $190,445.38. No proof of claim was filed by the creditor. Based upon a review of its books and records, Debtor objects to this claim and proposes that it be treated as an Allowed Claim in Class 1 at the reduced amount of $151,000.

37. UPS Lockbox 577 should be paid as an Allowed Claim in Class 1 of $33.82.

38. UPS SCS Dallas should be paid as an Allowed Claim in Class 1 of $2,187.12.

**Class 2.  Membership Loans. Unsecured, Impaired.**

Class 2 consists of all creditors with a membership interest in the Debtor who provided loans to the Debtor to support its obligations. The maximum amount of all Class 2 claims is $1,319,169. However, the Debtor believes that pursuant to its claim analysis, the appropriate amount for all claims in Class 2 is $1,241,128. All Class 2 creditors will receive a *pro rata* distribution of the net proceeds from the sale of Debtor's assets. The Class 2 claims are as follows:

1. Bob Fei should be paid an Allowed Claim in Class 2 of $100,000.

2. David Pobiak was scheduled by the Debtor with a claim of $175,000. Mr. Pobiak waived his claim as part of the PureCycle bid to purchase the Debtor's assets. Mr. Pobiak will not receive a distribution pursuant to this Plan.

3. David Stern should be paid an Allowed Claim in Class 2 of $9,572.

4. Dennis Avery should be paid an Allowed Claim in Class 2 of $50,000.

5. Eric Frische should be paid an Allowed Claim in Class 2 of $3,342.64.

6. Global Financial Services Consulting ("GFS") was scheduled by the Debtor in the amount of $538,241 along with Scott Alderson the member of GFS in the amount of $10,000. GFS filed Proof of Claim 3 which combines the amounts due to GFS and Mr. Alderson. Additionally Colette Winters filed Proof of Claim 11 in the amount of $0 demonstrating her interest in the GFS claim. GFS should be paid an Allowed Claim in Class 2 of $655,200.

7. Gray Layton Kersh should be paid an Allowed Claim in Class 2 of $68,506.73.

8. Keith Johnson should be paid an Allowed Claim in Class 2 of $68,506.73.

9. Kenneth Metzger should be paid an Allowed Claim in Class 2 of $51,000.

10. Lawton Hayes should be paid an Allowed Claim in Class 2 of $50,000.

11. Malcom Fages should be paid an Allowed Claim in Class 2 of $25,000.

12. Path X Defense, LLC should be paid an Allowed Claim in Class 2 of $140,000.

13. Rick Crosby should be paid an Allowed Claim in Class 2 of $20,000.


**Class 3.** **Administrative Claims of the U.S. Trustee, Administrative Expenses and Estate Professionals.** **Administrative Priority, Unimpaired.** This class consists of quarterly fees of the United States Trustee and any unpaid administrative claims of professionals. United States Trustee fees for the Debtor will be paid by the Debtor in full upon the due date and any amounts remaining due for quarterly fees must be paid prior to the closing of the case. The quarterly fees due to the United States Trustee under 28 U.S.C. § 1930 are not deemed subject to any bar date applicable to administrative claims and shall continue to be paid when due and/or prior to the dismissal of this Chapter 11.

The Debtor currently estimates post-petition professional fees for Debtor's counsel and the Estate Accountant and post-petition operating expenses in the aggregate amount of approximately $110,000. Post-petition professional fees incurred through the date of confirmation will only be paid upon Court approval. Unless otherwise ordered by the Court, and subject to the foregoing, post-petition professional fees incurred through the date of confirmation will be paid in full. The Debtor will maintain a reserve of $25,000 to pay all post-confirmation, professional fees and administrative expenses, which will be paid monthly in the ordinary course.


**Class 4.** **Watertech Holdings, LLC ("Equity Interests").** **Equity Holder, Impaired.** This Class consists of the Equity Interests in the Debtor. The Equity Interests will be terminated to the extent that net proceeds are insufficient to satisfy the claims of Class 1 through Class 3, unless such classes consent to alternative treatment.

## ARTICLE III

### Feasibility of Proposed Plan of Reorganization and Means of Effectuation

The Debtor believes and asserts that it has the ability to make the payments and execute the contingencies set forth in this Combined Disclosure Statement and Plan of Liquidation. The Debtor believes and asserts that it has the ability to pay all creditors as set forth herein. 11 U.S.C. §1129(a)(11) provides that in order for a plan of reorganization to be confirmed, it must be demonstrated that the plan is not likely to be followed by a liquidation or the need for further reorganization of the debtor. The Debtor's Plan calls for distribution of the proceeds generated by the Debtor from liquidation of the Debtor's assets. The Debtor believes that because all assets have been liquidated the Plan is not likely to be followed by further liquidation or the need for further reorganization of the Debtor.

## ARTICLE IV

### Conditions Precedent and Implementation of the Plan

**A.**     **Conditions precedent to Confirmation**

Prior to Confirmation, the Bankruptcy Court shall have signed, and the Clerk of the Bankruptcy Court shall have entered an order granting approval of the Disclosure Statement and find that the Disclosure Statement contains adequate information pursuant to section 1125 of the Bankruptcy Code, and such order shall have become a Final Order. The Order Confirming Plan (a/k/a the "Confirmation Order") shall have been signed by the Bankruptcy Court and entered by the Clerk of the Bankruptcy Court.

**B.**     **Implementation on the Effective Date**

This Plan shall become effective and operative upon the Effective Date of Confirmation. The Effective Date of Confirmation is the day that is fourteen (14) days after entry of the Order Confirming Plan unless any Order Confirming Plan shall be appealed, in which case the Effective Date shall be the day immediately after the Order Confirming Plan becomes a final, unappealed order.

## ARTICLE V

### Claims Bar Date, Objections to Claims, and

### Status of Claims Post-Confirmation

**A.**    **Allowance of Claims**

Except as expressly provided herein or any order entered in this Chapter 11 Case prior to the Effective Date (including the Order Confirming Plan), no Claim shall be deemed Allowed, unless and until such Claim is deemed Allowed under the Bankruptcy Code, is agreed to be Allowed by the Debtor, or is ordered Allowed by Final Order of the Bankruptcy Court. Except as expressly provided in this Plan, the Debtor after Confirmation, will have and retain any and all rights and defenses the pre-petition and pre-confirmation Debtor had with respect to any Claims, including, but not limited to, any causes of actions or defenses thereto.  The Debtor also retains the right to file any necessary motions or other pleadings for confirmation, estimation or determination of the amount of any disputed Claim. All Claims of any person or entity that owes money to the Debtor shall be disallowed unless and until such Person or Entity pays the full amount it owes the Debtor.

**B.**    **Claims Bar Date**

Unless otherwise ordered by the Court, the Claims Bar Date was **June 17, 2020 for all creditors except governmental units** and was **August 4, 2020 for a governmental unit** as such dates were set forth in the Court's Notice of Chapter 11 Bankruptcy Case, Meeting of Creditors, & Deadlines issued on the Petition Date in this Case.  Unless specifically ordered otherwise by the Court, only Claims scheduled by the Debtor without any contingent, unliquidated, or disputed notations, and those Claims filed by proof of claims on or before the Claims Bar Date, shall constitute Claims asserted against the Debtor in this Case.  Any Claims filed after the Claims Bar Date shall be automatically disallowed unless the claimant successfully obtains an order of the Court or consent of the Debtor allowing a late-filed proof of claim.  Any claim for United States Trustee fees is not subject to any deadline for administrative claims.

### C.        Authority to Prosecute Objections

The Debtor specifically reserves the right to object to any Claim the Debtor disputes, whether such Claim resulted from the Debtor's schedules or from a filed proof of claim.  After the Effective Date, only the Debtor and bankruptcy counsel shall have the authority to file objections to Claims and to settle, compromise, withdraw, or litigate to judgment objections to Claims.

### D.        Claims Objection Bar Date

Except as otherwise ordered by the Court, any and all objections to Claims shall be Filed with the Court and served upon the relevant Creditors by the date that is 45 days after the Effective Date or 180 days after such Claim or any amendment thereto is Filed, whichever date is later (the "Claims Objection Bar Date").  The Bankruptcy Court upon motion of the Debtor may extend this Claims Objection Bar Date. Any distributions called for in the Plan with respect to and on account of Claims to which objections have been filed, will be made, as detailed above, only after such Claim becomes an Allowed Claim.

### E.        Status of Claims After Confirmation

From and after Confirmation of this Plan, the Debtor is exonerated from any and all pre-petition Claims that were not filed by a creditor or claimant of interest against the Debtor prior to the Claims Bar Date set by this Court or otherwise scheduled by the Debtor without qualification.  The Debtor will, from and after Confirmation of this Plan, be indebted for, and obligated to pay, only those liabilities and obligations set forth in Article III of this Plan, and only those that are Allowed Claims.

## ARTICLE VI

## Executory Contracts

The Debtor Does not believe it is party to any contracts that are executory in nature, as reflected on Debtor's Schedule G. [Docket No. 1, page 25].

## ARTICLE VII

### Tax Consequences

Subject to the limitations noted below, the following discussion is a summary of certain U.S. federal income tax consequences expected to result from the implementation of the Plan relevant to holders of Claims entitled to vote with respect to adoption of the Plan. This discussion is based on the Internal Revenue Code of 1986, as amended (the "Revenue Code"), in effect on the date of this Disclosure Statement, on U.S. Treasury Regulations in effect (or in certain cases, proposed) on the date of this Disclosure Statement, and on judicial and administrative interpretations thereof available on or before such date. All of the foregoing is subject to change, which change could apply retroactively and could affect the tax consequences described below. There can be no assurance that the Internal Revenue Service (the "IRS") will not take a contrary view with respect to one or more of the issues discussed below, and no ruling from the IRS or opinion of counsel has been sought with respect to any issues that may arise under the Plan.

The following summary is for general information only and does not purport to address all of the U.S. federal income tax consequences that may be applicable, including to any particular Claim holder or Equity Interest. The tax treatment of a holder of a Claim or a Claim of Interest will vary depending upon such holder's particular situation. The following discussion does not address state, local or foreign tax considerations that may be applicable to the Debtor or to a holder of a Claim or an Equity Interest. This summary does not address tax considerations applicable to holders that may be subject to special tax rules.

No statement in this Combined Disclosure Statement and Plan should be construed as legal or tax advice. The Debtor and its professionals do not assume any responsibility or liability for tax consequences that the holder of a Claim or an Equity Interest may incur as a result of the treatment afforded a Claim or Equity Interest under the Plan.

EACH HOLDER OF A CLAIM OR AN INTEREST IS URGED TO CONSULT ITS OWN TAX ADVISOR WITH RESPECT TO THE PLAN, INCLUDING ANY APPLICABLE FEDERAL, STATE, LOCAL AND FOREIGN TAX CONSEQUENCES OF THE PLAN.

TO ENSURE COMPLIANCE WITH TREASURY DEPARTMENT CIRCULAR 230,

HOLDERS OF CLAIMS OR EQUITY INTERESTS ARE HEREBY NOTIFIED THAT: (A) ANY DISCUSSION OF FEDERAL TAX ISSUES IN THIS DISCLOSURE STATEMENT IS NOT INTENDED OR WRITTEN TO BE RELIED UPON, AND CANNOT BE RELIED UPON, BY HOLDERS OF CLAIMS OR EQUITY INTERESTS FOR THE PURPOSE OF AVOIDING PENALTIES THAT MAY BE IMPOSED UNDER THE REVENUE CODE; (B) SUCH DISCUSSION IS BEING USED IN CONNECTION WITH THE PROMOTION OR MARKETING (WITHIN THE MEANING OF CIRCULAR 230) BY THE DEBTOR; AND (C) HOLDERS OF CLAIMS OR EQUITY INTERESTS SHOULD SEEK ADVICE OF AN INDEPENDENT TAX ADVISOR BASED ON THEIR PARTICULAR CIRCUMSTANCES.

### A.  Federal Tax Consequences to the Debtor

The Debtor is a manager-managed limited liability company.  Any income tax liabilities or other attributes arising as a result of or in connection with the execution of the Plan will generally flow through to the holders of membership interests in the Debtor.

Subject to certain limitations, any losses reported on previous tax returns were passed through to the members. These losses and any refunds or tax benefits attributable thereto are personal to the members and are not available to creditors as an asset of the Debtor.

### B.  Federal Tax Consequences to Holders of Claims or Equity Interests

The federal income tax consequences of the implementation of the Plan to the holders of Allowed Claims or Equity Interests will depend on, among other things, the consideration to be received by the Claim holder, whether the Claim or Interest holder reports income on the accrual or cash method, whether the Claim or Interest holder receives distributions under the Plan in more than one taxable year, and whether the Claim holder has previously taken any bad debt deduction or a worthless security deduction with respect to its Claim.

In general, a holder of an Allowed Claim should recognize gain or loss equal to the amount realized under the Plan in respect of its Claim less the holder's tax basis in the Claim. Any gain or loss recognized may be long-term or short-term capital gain or loss or ordinary income or loss, depending upon the nature of the Allowed Claim and the holder, the length of time the holder held the Claim and whether the Claim was acquired at a market discount. If the holder realizes a capital loss, the holder's deduction of the loss may be subject to limitation. The holder's tax basis for any property received under the Plan generally will equal the amount realized. The holder's amount realized should equal the sum of the Cash and the fair market value of any other property received by the holder under the Plan, less the amount (if any) treated

as interest, as discussed below.

Because certain holders of Allowed Claims may receive Cash distributions after the Effective Date, the imputed interest provisions of the Code may apply and cause a portion of the subsequent distributions to be treated as interest. Additionally, because holders may receive distributions with respect to an Allowed Claim in a taxable year or years following the year of the initial distribution, any loss and a portion of any gain realized by the holder may be deferred. All holders of Allowed Claims are urged to consult their tax advisors regarding the possible application of (or ability to elect out of) the "installment method" of reporting with respect to their Claims.

Holders of Allowed Claims will recognize ordinary income to the extent that they receive Cash or property that is allocable to accrued but unpaid interest that the holder has not yet included in its income. If an Allowed Claim includes interest, and if the holder receives less than the amount of the Allowed Claim pursuant to the Plan, the holder must allocate the Plan consideration between principal and interest.  Holders of Allowed Claims should consult their own tax advisors in this regard. If the Plan consideration allocable to interest with respect to an Allowed Claim is less than the amount that the holder has previously included as interest income, the previously included but unpaid interest may be deducted, generally as a loss.

A holder who receives in respect of a Claim or an Interest an amount less than the holder's tax basis in the Claim or Interest may be entitled in the year of receipt (or in an earlier or later year) to a bad debt deduction in some amount under Section 166(a) of the Code, a loss under Section 165(a), or a worthless securities deduction under Section 165(g) of the Code. The rules governing the character, timing and amount of bad debt, loss, and worthless securities deductions place considerable emphasis on the facts and circumstances of the holder, the obligor and the instrument with respect to which a deduction is claimed. Holders of Claims or Interests, therefore, are urged to consult their tax advisors with respect to their ability to take such a deduction.

### C.  Backup Withholding Tax and Information Reporting Requirements

U.S. federal backup withholding tax and information reporting requirements generally apply to certain payments to certain non-corporate Claim holders. Information reporting generally will

apply to payments under the Plan, other than payments to an exempt recipient. The Debtor may be required to withhold backup withholding tax from any payments made under the Plan, other than payments to an exempt recipient, if such Claim holder fails to furnish its correct taxpayer identification number or otherwise fails to comply with, or establish an exemption from, such backup withholding tax requirements.

THE ABOVE SUMMARY HAS BEEN PROVIDED FOR INFORMATIONAL PURPOSES ONLY. THIS DISCLOSURE STATEMENT IS NOT INTENDED, AND SHOULD NOT BE CONSTRUED, AS LEGAL OR TAX ADVICE TO ANY CREDITOR OR EQUITY INTEREST HOLDER. ALL HOLDERS OF CLAIMS OR INTERESTS ARE URGED TO CONSULT THEIR OWN TAX ADVISORS WITH RESPECT TO THE U.S. FEDERAL, STATE, LOCAL AND FOREIGN TAX CONSEQUENCES OF THE IMPLEMENTATION OF THE PLAN.

## ARTICLE VIII

### Jurisdiction

1.  <u>Retention of Jurisdiction</u>.  The Court shall retain jurisdiction over the Debtor, its property, and all other parties appearing in this Case as provided by this Plan or by further Order of the Court. The Court shall retain jurisdiction as provided in the Bankruptcy Code until entry of the final decree closing the bankruptcy Case and as set forth thereafter in the final decree.   To the extent that may be necessary, Debtor may request that the Court enter a final order closing the Case but retaining jurisdiction for a limited purpose, including, but not limited to, presiding over any adversary proceedings or claim objections that may be pending at the time of the closing of the bankruptcy Case.

2.  <u>Prosecution and Defense of Claims</u>.  The Debtor shall retain full power after Substantial Consummation to prosecute and defend any causes of action or proceedings existing at Substantial Consummation by or against it, or resulting from the administration of the estate of the Debtor or resulting from any other claim by or against the Debtor or its assets, or arising prior to or existing before Substantial Consummation.  Such reservations specifically include, but are not limited to, prosecution/assertion of claims objections.

25

## ARTICLE IX

### Post-Confirmation Acts

1.    The Debtor, by and through its agents and Bob Fei its manager shall perform all acts necessary to complete and consummate this Plan, to include:

    a.  Prosecution of all claims and causes of action against third parties by the Debtor and claims objections filed by the Debtor against third parties;

    b.  Execution and filing of all legal documents required; and

    c.  Performing any and all functions required by the Code.

2.    In addition to the continuing monthly reporting requirements that will continue until a final decree is entered in the Case, the Debtor shall cause to be filed with the Court a final report containing an itemized list of all disbursements by the Debtor after the Petition Date in this Case.

## ARTICLE X

### "Cram Down" for Impaired Creditors

### Not Accepting the Plan

With respect to any class of creditors impaired but not accepting the Plan by the requisite majority in number and two-thirds in amount, the proponent of this Plan requests that the Court find that the Plan does not discriminate unfairly and is fair and equitable with respect to each class of Claims or Interest that are impaired under the Plan and that the Court confirm the Plan without such acceptances by the rejecting Impaired classes.

## ARTICLE XI

### Discharge of the Debtor

Under the Plan, the effects of Confirmation shall be as provided under Bankruptcy Code sections 1141(a), (b), (c), and (d)(3). The Debtor and the estate shall continue to exist following Confirmation and until Final Consummation. Pursuant to section 1141(d)(3) of the Bankruptcy Code, the Debtor shall not be discharged by Confirmation or under the Plan.  Upon obtaining a discharge, the Debtor will file its final tax returns and dissolve with the South Carolina Secretary

of State.

RESPECTFULLY SUBMITTED on this the 21st day of August 2020 at Columbia, South Carolina.

MCCARTHY, REYNOLDS, & PENN, LLC

By:    <u>/s/ W. Harrison Penn</u>
G. William McCarthy, Jr., I.D.#2762
Daniel J. Reynolds, Jr., I.D.#9232
W. Harrison Penn, I.D.#11164
*Attorneys for the Debtor*
1517 Laurel Street (29201)
P.O. Box 11332
Columbia, SC 29211-1332
(803) 771-8836
(803) 765-6960 (fax)
hpenn@mccarthy-lawfirm.com